# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 4, 2014  Decided September 1, 2015

No. 11-3054

UNITED STATES OF AMERICA,
APPELLEE

v.

ANDERSON STRAKER, ALSO KNOWN AS GYPSY'S SON, ALSO
KNOWN AS ANDY,
APPELLANT

———

Consolidated with 11-3055, 11-3056, 11-3057, 11-3058,
11-3059, 11-3061

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:06-cr-00102)

———

No. 11-5124

ZION CLARKE, ET AL.,
APPELLANTS

v.

2

LORETTA E. LYNCH, ATTORNEY GENERAL, U.S. DEPARTMENT
OF JUSTICE AND VINCENT H. COHEN JR., ACTING UNITED
STATES ATTORNEY FOR THE DISTRICT OF COLUMBIA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00753)

———

*Victoria Killion*, *Charles B. Wayne*, *Andrew M. Treaster*, *Jonathan S. Zucker*, *Paul S. Rosenzweig*, *Steven R. Kiersh*, and *Andrew Macurdy*, appointed by the court, argued the causes for appellants. With them on the briefs were *Justin S. Antonipillai*, *Leeann R. Morentz*, *Jeffrey B. O'Toole*, *Christopher S. Rhee*, *Jocelyn A. Wiesner*, and *Pleasant S. Brodnax III*, appointed by the court. *Lisa S. Blatt* entered an appearance.

*David B. Goodhand* and *W. Mark Nebeker*, Assistant U.S. Attorneys, argued the causes for appellees. With them on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, *Bruce R. Hegyi*, Trial Attorney, U.S. Department of Justice, and *R. Craig Lawrence*, *Elizabeth Trosman*, and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

Before: TATEL, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: The Hostage Taking Act, 18 U.S.C. § 1203, prescribes criminal penalties for foreign nationals who abduct American citizens. In this case, nationals of the Republic of

Trinidad and Tobago abducted wealthy individuals, held them captive in the island's mountainous forests, and extorted ransoms from terrified family and friends. The scheme proved quite profitable—at least until they kidnapped an American citizen and ran headlong into the Hostage Taking Act. The conspirators were extradited to the United States, tried, and convicted of violating the Act. But does that statute apply if, as defendants allege, the victim secured his United States citizenship through fraud? The district court held that it does, and for the reasons set forth in this opinion, we agree. Rejecting all of the conspirators' other challenges, we affirm their convictions in all respects.

## I.

By early 2005, defendants Wayne Pierre, Ricardo De Four, and Zion Clarke had perfected their hostage-taking protocol and regularly extorted six-figure ransoms (Trinidadian dollars). Looking to up the ante, the three enlarged their organization to include defendants Kevon Demerieux, Kevin Nixon, Christopher Sealey, and Anderson Straker, and set their sights on Trinidad-native Balram Maharaj, whom they believed had amassed a fortune in the United States. Although naturalized as an American citizen in 1995, Maharaj frequently visited his children in Trinidad. Defendants, assisted by a host of unindicted co-conspirators, planned to abduct Maharaj during one of those visits.

On the night of April 6, 2005, defendants executed their plan. Sealey and Nixon, armed with handguns, dragged Maharaj from Samaan Tree Bar in Aranguez, Trinidad and forced him into a getaway car while De Four drove ahead in a separate vehicle to clear the way. Sealey and Nixon delivered Maharaj to an isolated camp deep within the forest where Clarke and Demerieux guarded him. A nightmare ensued.

The two guards tied Maharaj to a post and gave him little food and water. Suffering from severe diabetes, hypertension, and tuberculosis, Maharaj pleaded for medication. Clarke and Demerieux ignored his pleas while their co-conspirator, Winston Gittens, used Maharaj's worsening health as leverage to demand three million Trinidadian dollars from his family. Bound and gagged, Maharaj repeatedly refused defendants' attempts to record a "proof of life" video, even when Straker threatened to harm Maharaj's son. After six days in captivity, Maharaj slipped into a diabetic coma and died.

Well aware that they had killed a United States citizen, defendants voted to conceal their crime. "No body, no evidence, no case," proclaimed Pierre. Using a machete and their bare hands, Clarke, Demerieux, and Pierre removed Maharaj's internal organs and dismembered his body. They packed the remains in Styrofoam containers and buried them in the woods. As with most buried secrets, however, defendants' misdeeds eventually surfaced.

In late 2005, the Trinidad and Tobago Police Service began an investigation of defendants' hostage-taking ring. Assisted by the FBI, Trinidadian police ultimately uncovered evidence of Maharaj's death. The United States extradited defendants and charged them with conspiracy and hostage-taking resulting in death in violation of the Hostage Taking Act. The facts and circumstances surrounding the kidnapping are largely undisputed—indeed, five of the seven defendants confessed. Defendants primarily argue that Maharaj misrepresented key facts on his immigration applications, thus negating his United States citizenship—an essential element of a Hostage Taking Act prosecution. The district court rejected this argument, as well as numerous other objections. After a ten-week trial, the jury convicted

defendants of all charges, and the district court sentenced them to life imprisonment without the possibility of release.

Defendants now appeal their convictions on numerous grounds. We address the arguments pertaining to Maharaj's citizenship in Part II and then consider defendants' other arguments in Parts III through XI.

## II.

Enacted to fulfill the United States' obligations under the International Convention Against the Taking of Hostages, the Hostage Taking Act, 18 U.S.C. § 1203, makes extraterritorial hostage-taking a criminal offense when the victim is a United States national. On appeal, it is undisputed that at the time of his death Balram Maharaj possessed an authentic certificate of naturalization.

Before trial, however, defendants uncovered evidence they claim demonstrates that Maharaj obtained his naturalization through fraud. According to this evidence, Maharaj, formerly Aladdin Barlow John, first entered the United States in 1967 as a non-immigrant transit en route to Canada. Following a short visit there, Maharaj returned to the United States, briefly settling in New York before enlisting in the Army in 1968. He deserted seven months later. In order to avoid prosecution for desertion, Maharaj completed a clemency program and was ultimately discharged from the Army as undesirable.

In April 1986, the Immigration and Naturalization Service (INS), having discovered that Maharaj had overstayed his 1967 transitory permit, ordered him to leave the United States. But instead of leaving, he petitioned INS for permanent-resident alien status, also known as a green card. Asked on his green

card application whether he had ever been convicted of a crime involving moral turpitude, Maharaj checked "no" even though, defendants claim, he had once pleaded guilty to petty larceny and was on probation. Maharaj also checked "no" when asked whether he had ever suffered an "attack of insanity," narcotic drug addiction, or chronic alcoholism, even though his ex-wife would years later attest in an unrelated proceeding that he had previously spent time in a mental-health facility, attempted suicide, and chronically abused alcohol and prescription drugs. INS granted Maharaj's petition.

After maintaining permanent-resident status for five years, Maharaj applied for full naturalization in 1994. On the application, Maharaj checked "no" when asked whether he had ever been ordered deported. And when asked whether he had ever knowingly committed a crime for which he had not been arrested, he checked "no" even though his ex-wife had testified that he once physically assaulted and raped her. INS granted Maharaj citizenship in 1995.

The question whether Maharaj's misrepresentations negated his citizenship and, in turn, defendants' guilt, was the most contested issue throughout the proceedings in the district court. Defendants first raised the issue in a motion to dismiss the indictment, arguing that because conviction under the Hostage Taking Act requires U.S. citizenship and because Maharaj's fraud negated his citizenship, the district court lacked jurisdiction. The district court disagreed. Citing a long and unbroken line of Supreme Court precedent, *see, e.g.*, *United States v. Zucca*, 351 U.S. 91, 95 & n.8 (1956); *see also Bindczyck v. Finucane*, 342 U.S. 76, 83 (1951), the district court held that 8 U.S.C. § 1451, which permits the United States Attorney to institute denaturalization proceedings in a federal district court, is the exclusive procedure for voiding the citizenship of a person naturalized due to fraud. *United States*

*v. Clarke*, 628 F. Supp. 2d 1, 9 (D.D.C. 2009). Citizenship, the court held, remains valid until a district court, acting upon a United States Attorney's section 1451 motion, determines that naturalization was "procured by concealment of a material fact or fraud." *Id.* at 6 (quoting 8 U.S.C. § 1451(a)). Given that no district court had ever made such a finding as to Maharaj, the court denied the motion. *Clarke*, 628 F. Supp. 2d at 10.

The district court also granted the government's motion in limine to exclude from trial any evidence regarding Maharaj's alleged fraud. *Id.* at 13. Conviction under the Hostage Taking Act, the court held, requires the government to prove that the victim acquired citizenship by birth or naturalization. *Id*. at 13. Evidence disputing whether the victim should have been naturalized or the circumstances surrounding naturalization is irrelevant. *Id*. The court therefore rejected defendants' argument that they had a Sixth Amendment right to present evidence regarding Maharaj's alleged fraud to the jury. *Id*. at 14. "[T]he jury," the district court concluded, "may not decide the validity of Maharaj's citizenship." *Id.* at 13.

At trial, the government offered Maharaj's certificate of naturalization and two passports as evidence of his citizenship. An employee of the U.S. Citizenship and Immigration Service testified that INS issued the certificate of naturalization in 1995. A State Department Fraud Program Manager testified that Maharaj's two passports, issued in 1995 and 2000, were authentic. On cross examination, however, defense counsel pointed out that Maharaj's 1995 passport was unsigned and, as the witness conceded, invalid. *See* 22 C.F.R. § 51.4(a) ("A passport book is valid only when signed by the bearer in the space designated for signature[.]"). The district court struck the 1995 passport from evidence and ruled that challenges to the authenticity of the 2000 passport, issued solely on the basis

of the stricken 1995 passport, were fair game. In sum, then, the district court permitted defendants to argue that the citizenship documents were inauthentic, *i.e.*, forged or counterfeit, but barred them from collaterally attacking INS's decision to naturalize Maharaj.

In its final instructions, the district court reminded the jury that the victim's citizenship was an essential element of the crime that the government must prove beyond a reasonable doubt. The 2000 passport and the naturalization certificate, the court instructed, *may* be considered as evidence of citizenship. In closing arguments, defense counsel pressed this point, claiming that the invalidity of the 1995 passport called into question the authenticity of the 2000 passport, as well as the naturalization certificate.

After the jury returned a guilty verdict, defendants, reiterating their earlier arguments, moved for a judgment of acquittal, or alternatively a new trial. Relying on its prior reasoning, the district court denied the motion. *United States v. Clarke*, 767 F. Supp. 2d 12, 65 (D.D.C. 2011).

The criminal trial was not the only forum in which defendants challenged Maharaj's citizenship. Prior to trial, defendants submitted affidavits to the United States Attorney for the District of Columbia detailing Maharaj's alleged fraud and requesting initiation of section 1451 proceedings. When the U.S. Attorney took no action, defendants petitioned the district court for a writ of mandamus requiring the U.S. Attorney to initiate denaturalization proceedings. The government moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of jurisdiction and 12(b)(6) for failure to state a claim. The district court granted the Rule 12(b)(1) motion, finding that defendants lacked constitutional standing because they failed to demonstrate that their requested

remedy—initiation of section 1451 proceedings—would redress their claimed injury, *i.e.*, denial of the right to present evidence in the criminal trial. It is "wholly speculative," the court concluded, whether the U.S. Attorney could meet the high burden of proof necessary to denaturalize Maharaj, "especially in light of evidentiary problems that may arise so long after Maharaj's death and his inability to defend himself." *Clarke v. Holder*, 767 F. Supp. 2d 106, 109 (D.D.C. 2011). Alternatively, the district court found that even if defendants could establish standing, they failed to meet the threshold requirements for mandamus relief because the U.S. Attorney had no clear duty to seek posthumous denaturalization of Maharaj. *Id*. at 112–13.

On appeal, defendants argue that the district court lacked jurisdiction under the Hostage Taking Act and erred in excluding evidence contesting the validity of Maharaj's naturalization. Defendants also appeal the district court's denial of their petition for a writ of mandamus. We address each issue in turn.

**The Criminal Conviction**

Defendants argue that "[s]ubject matter jurisdiction . . . hinges entirely on Mr. Maharaj's citizenship." Def. Br. 12. This, however, misapprehends the nature of federal court jurisdiction in criminal cases. A claim that an element of the offense is unsatisfied—that the victim was not a United States citizen, for example—goes only to a defendant's guilt or innocence. In other words, jurisdiction hinges not on the merits, but rather on the court's constitutional or statutory power to adjudicate the case. *Lamar v. United States*, 240 U.S. 60, 64 (1916) ("Jurisdiction is a matter of power, and covers wrong as well as right decisions."). Under 18 U.S.C. § 3231, federal district courts possess statutory authority over

"all offenses against the laws of the United States." Because violation of the Hostage Taking Act is an offense against the laws of the United States, our jurisdictional inquiry ends and we turn to the merits of defendants' appeal. *United States v. Fahnbulleh*, 752 F.3d 470, 476 (D.C. Cir. 2014) ("If an indictment or information alleges the violation of a crime set out in Title 18 or in one of the other statutes defining federal crimes, that is the end of the jurisdictional inquiry.") (internal quotation marks omitted).

Defendants make two arguments. They first claim that the district court's exclusion of evidence regarding Maharaj's alleged fraud violated their constitutional right to present a complete defense. They also argue that the district court removed the citizenship question from the jury, thus relieving the government of its burden to prove Maharaj's citizenship beyond a reasonable doubt.

With respect to both arguments, our starting point is the text of the Hostage Taking Act. Section 1203(b)(1)(A) criminalizes hostage-taking that occurs outside the United States if "the person seized or detained is a national of the United States." A "national of the United States" is, in turn, defined by reference to the Immigration and Nationality Act as "a citizen of the United States." 18 U.S.C. § 1203(c); 8 U.S.C. § 1101(a)(22). By its plain language, then, section 1203 broadly protects United States citizens. The statute imposes no restriction on this protection. It does not, for example, exclude citizens who, in retrospect, are unworthy of the honor. Nor does it exclude persons whose citizenship might at some later time be invalidated. In other words, section 1203 protects victims according to their status at the time of the hostage-taking.

True, section 1203 is written in the present tense—the statute applies if "the person seized or detained *is* a national of the United States." But that clause appears in a criminal statute that requires examination of past events—whether the victim *was* seized or detained. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (use of backward-looking language such as "resulted in" and "involved" in federal habeas statute, 28 U.S.C. § 2254(d), requires examination of the state-court decision at the time it was made). A more familiar statute, the Armed Career Criminal Act, provides a helpful parallel. The ACCA imposes a sentence enhancement if the defendant "has three previous convictions . . . for . . . serious drug offense[s]" for which "a maximum term of imprisonment of ten years or more *is* prescribed by law." 18 U.S.C. § 924(e) (emphasis added). As the Supreme Court has explained, "[t]he plain text of ACCA" therefore "requires the court to determine whether a '*previous* conviction' *was* for a serious drug offense." *McNeill v. United States*, 131 S. Ct. 2218, 2221–22 (2011) (emphases added). To answer that "backward-looking question," the Court held that the sentencing court must "consult the law that applied at the time of that conviction." *Id*. at 2222. So too here. Determining whether an American citizen *was* seized or detained under the Hostage Taking Act requires examination of the victim's status at the time of the abduction.

This focus on status at the time of the crime is hardly unusual. For instance, convictions under the federal statute that bars felons from possessing firearms rest solely upon the *fact* of the prior felony. *Lewis v. United States*, 445 U.S. 55, 62–65 (1980). The *validity* of the prior conviction is irrelevant even when that conviction is patently unconstitutional. *Id*.; *see also Custis v. United States*, 511 U.S. 485, 493–97 (1994) (defendants in federal sentencing proceedings may not, with a narrow exception for certain convictions obtained in violation of the right to counsel,

challenge the validity of prior state convictions used to enhance sentences under the Armed Career Criminal Act). Likewise, defendants accused of providing material support to designated foreign terrorist organizations in violation of 18 U.S.C. § 2339B may not challenge the validity of the designation. *United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (en banc) ("Congress has provided that the *fact* of an organization's designation as an FTO is an element of § 2339B, but the *validity* of the designation is not."), *rev'd on other grounds*, 543 U.S. 1097 (2005); *see also United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir. 1990) (defendants charged with illegally exporting items on the Secretary of Commerce's Commodity Control List may not challenge the validity of the Secretary's designation).

Finally, our interpretation of the Hostage Taking Act reinforces its purpose. When President Reagan proposed the bill that ultimately became the Act, he declared that it would "send a strong and vigorous message to friend and foe alike that the United States will not tolerate terrorist activity against its citizens[.]" *President's Message to the Congress Transmitting Proposed Legislation to Combat International Terrorism*, Pub. Papers, Admin. of Ronald Reagan 3–4 (Apr. 26, 1984). This "strong and vigorous message" would be severely diluted if foreign nationals could target American citizens for abduction and then avoid prosecution in the United States by impugning the victim's character. This is especially true where, as here, defendants targeted the victim not only because he was an American, but also because he had assets in the United States. Permitting them to escape prosecution by arguing that Maharaj was undeserving of United States citizenship would weaken the protection Congress intended to extend to Americans abroad.

For all of these reasons, the district court properly excluded evidence of Maharaj's alleged fraud as irrelevant. Congress has vested sole naturalization authority in the Attorney General, 8 U.S.C. § 1421(a), and a certificate of naturalization represents conclusive evidence of the Attorney General's determination, *Tutun v. United States*, 270 U.S. 568, 577 (1926); 8 U.S.C. § 1443(e). As explained above, whether the Attorney General, acting through INS, should have issued a certificate to Maharaj—as opposed to whether the certificate was itself authentic—is irrelevant under the Hostage Taking Act.

**The Mandamus Proceedings**

This brings us to defendants' appeal of the district court's denial of their petition for a writ of mandamus requiring the United States Attorney to initiate posthumous denaturalization proceedings against Maharaj under 8 U.S.C. § 1451. Recall that the district court denied the petition on the grounds that defendants lacked standing and, alternatively, that they failed to meet the requirements for mandamus relief. *Clarke v. Holder*, 767 F. Supp. 2d 106, 116 (D.D.C. 2011). Because we agree with the former ruling, we need not address the latter.

In order to have Article III standing to bring their mandamus action, defendants must prove that they suffered (1) an "injury in fact" that is (2) "fairly . . . traceable to the challenged action," and that is (3) likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). The district court found that defendants failed to establish the third element, redressability, *i.e.*, "a substantial likelihood that the relief requested will redress the injury claimed." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978) (internal quotation marks omitted). Reviewing

defendants' evidence, the district court thought it "wholly speculative" whether the government could meet section 1451's burden of proving fraud by "clear, unequivocal, and convincing evidence." *Clarke*, 767 F. Supp. 2d at 109, 112 (quoting *Fedorenko v. United States*, 449 U.S. 490, 505 (1981)).    Given this, defendants' alleged "injury—their hostage taking convictions—is not redressable by an order directing [the government] to initiate [a section 1451] proceeding." *Clarke*, 767 F. Supp. 2d at 109.

Defendants challenge the district court's conclusion on two grounds.    First, they claim that their "injury is the lack of opportunity to present a defense," which is "necessarily . . . redressed if the Government is compelled to bring a § 1451 hearing against Mr. Maharaj." Def. Mandamus Br. 9. Second, they argue that the district court's evidentiary rulings in the criminal trial, together with its dismissal of their mandamus petition, ensnare them in a catch-22: defendants "could not show the citizenship evidence at trial because the district court had ruled that a Government-initiated § 1451 proceeding was the exclusive avenue for presenting such evidence, but they could not present the evidence in a § 1451 proceeding because the district court would not allow them to challenge the Government's inaction." *Id*. at 8.

Both arguments are foreclosed by the conclusion we reached in the previous section, *i.e.*, that conviction under the Hostage Taking Act depends upon the victim's citizenship at the time of the crime.    Balram Maharaj possessed American citizenship when defendants abducted him in 2005.    Whatever happens now is irrelevant.    In other words, *even if* the government were to strip Maharaj of his United States citizenship under section 1451, defendants' convictions would stand because Maharaj possessed a valid naturalization certificate at the time of the crime.    Defendants' alleged injury

is therefore incapable of redress not because the outcome of the section 1451 proceeding is too speculative (as the district court found), but because the outcome of those proceedings could not possibly affect defendants' right to present a full defense to a charge under the Hostage Taking Act.

We reach this conclusion despite section 1451's relation-back provision, which provides that denaturalization on account of fraud "shall be effective as of the original date of the [naturalization] order and certificate." 8 U.S.C. § 1451(a). Based on this provision and pre-section 1451 case law espousing the relation-back principle, defendants argue that denaturalization on account of Maharaj's fraud would retroactively void his naturalization, meaning that he *never* possessed citizenship and thus was not a national under the Hostage Taking Act. Def. Mandamus Br. 11 n.8.

The Supreme Court, however, has rejected mechanical application of section 1451's relation-back principle. *Costello v. Immigration and Naturalization Service*, 376 U.S. 120, 130 (1964). In *Costello*, the Court examined section 1451's language and legislative history to determine whether the provision applied to the "general deportation provisions" of the Immigration and Nationality Act. *Id*. at 129. The Court concluded that Congress intended the relation-back provision simply to codify pre-existing case law that retroactively voided fraudulently-acquired naturalization for the purpose of determining derivative citizenship, *i.e.*, citizenship conveyed to children through the naturalization of one or both parents. *Id*. Calling relation-back a "legal fiction," the Court refused, absent express congressional command, to extend that fiction to require deportation of a denaturalized individual on the theory that crimes committed prior to his denaturalization rendered him an alien despite possession of a then-valid naturalization certificate. *Id*. at 130, 132.

Likewise, nothing in the text or legislative history of section 1451—or the Hostage Taking Act—suggests that Congress intended the relation-back doctrine to apply in a criminal prosecution. Indeed, as explained above, applying the doctrine in this context would weaken the purpose of the Hostage Taking Act. *See supra* at 11. We therefore decline, as did the Supreme Court in *Costello*, to extend the legal fiction of relation-back into the realm of criminal law. *See Costello*, 376 U.S. at 130.

## III.

### Objections to Introduction of Evidence of Other Crimes

Defendants challenge the district court's admission, over their repeated objections, of evidence of three other, uncharged hostage takings that occurred within four months of the Maharaj hostage taking.[1] We conclude that the district court did not err in admitting that evidence. It was relevant under Rule 404(b) as background showing how the conspiracy

---

[1] All defendants, with the exception of Straker, state in a footnote in their brief their intention to join this argument. Def. Br. 29 n.9. While adoption by reference pursuant to Federal Rule of Appellate Procedure 28(i) may streamline the appeal of common legal issues, it threatens to confuse those issues that litigants do not share. *See United States v. Renteria*, 720 F.3d 1245, 1251 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 969 (2014); *United States v. Santana-Pérez*, 619 F.3d 117, 122 (1st Cir. 2010). The evidence of other crimes was admitted only against Pierre, De Four, and Clarke. The remaining defendants, against whom the evidence was not admitted, fail to articulate how it affected their rights. Any potential prejudice to them of being tried jointly with the defendants against whom the prior-crimes evidence was admitted is addressed in connection with objections that certain defendants' trials should have been severed.

formed and certain defendants' intent. Given the care the district court took to limit and focus the evidentiary presentation, its prejudicial potential did not outweigh its probative value under Rule 403.

**A.**

Before trial, the government submitted a notice of its intent to introduce evidence that some of the defendants participated in uncharged hostage takings. The district court admitted the evidence as relevant to issues other than the defendants' bad character—namely "the background of the conspiracy and how the relationships between the participants developed, as well as defendants' motive, intent, knowledge, preparation, and plan." *United States v. Straker*, 567 F. Supp. 2d 174, 178–79 (D.D.C. 2008). The evidence was strongly probative, in the district court's view, and thus its value was not substantially outweighed by the "fairly low" danger of unfair prejudice. *Id.* at 179.

The district court restricted the government's presentation of the "other crimes" evidence in order to avoid "unnecessary presentation of cumulative evidence and to minimize the danger of unfair prejudice." *Id.* The district court precluded the government from introducing any evidence concerning the Gopaul hostage taking—an offense in which the hostage takers apparently killed the victim after they received an unsatisfactory ransom offer—because that evidence presented "the most likely case for some degree of unfair prejudice." *Id.* Additionally, the court permitted the government to introduce only three of the four other uncharged hostage takings the government identified, *id.*; *see also* J.A. 961–62, and limited the testimony on those to three hours each. J.A. 3171–72.

The government accordingly introduced at trial evidence that defendants Pierre and De Four participated in three of the

uncharged hostage takings, and that defendant Clarke participated in two of them. The evidence came in through the testimony of the four cooperating co-conspirators and six additional witnesses, including the victim of one hostage taking and Trinidadian law enforcement officials involved in investigating the other hostage takings. The district court gave limiting instructions to the jury periodically during the trial, informing it that the evidence of other hostage takings was admissible only against the specific defendants the jury found were involved in them and explaining the purposes for which the evidence could, and could not, be considered. *See Clarke*, 767 F. Supp. 2d at 27–28.

**B.**

On appeal, defendants argue that the district court's admission of evidence of the three uncharged hostage takings violated Rule 404(b) because it was not admitted for any of the valid purposes enumerated in that Rule, but impermissibly to show their bad characters and propensity to commit the charged crimes. The evidence's probative value was substantially outweighed by its unfair prejudicial effect, they assert, and was presented in a confusing and prejudicial manner, so should have been excluded under Rule 403.

The evidentiary limitation in Rule 404(b) implements the fundamental tenet of our criminal justice system that defendants may be convicted only for violating the law, not for being bad people. *United States v. Sutton*, 801 F.2d 1346, 1360 (D.C. Cir. 1986). The Rule prohibits the admission of evidence of a crime, wrong, or other bad act "when offered for the purpose of proving that a defendant acted in conformity with his character, but allows admission so long as the evidence is offered for any other relevant purpose." *United States v. Lawson*, 410 F.3d 735, 741 (D.C. Cir. 2005); *United*

*States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000); *see also* Fed. R. Evid. 404(b)(1). Relevant, non-propensity purposes include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Even if a court determines that the prosecution's other-crimes evidence is relevant to an issue apart from propensity, the evidence may nonetheless be excluded under Rule 403 if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *Bowie*, 232 F.3d at 930. Even if it is concededly relevant, unduly prejudicial evidence may be excluded to prevent jurors from impermissibly relying on biases, dislikes, or the emotional impact of the evidence, for example by drawing on assumptions about a defendant's bad character, rather than proof of the criminal conduct charged. The Rule's requirement that the danger of unfair prejudice *substantially* outweigh probative value calls on us, in close cases, to lean towards admitting evidence. *United States v. Douglas*, 482 F.3d 591, 600 (D.C. Cir. 2007); *United States v. Manner*, 887 F.2d 317, 322 (D.C. Cir. 1989).

We review a district court's admission of other-crimes evidence for abuse of discretion, *United States v. Mathis*, 216 F.3d 18, 25–26 (D.C. Cir. 2000), according "substantial deference" to the district court, *Lawson*, 410 F.3d at 741; *see also United States v. Long*, 328 F.3d 655, 660 (D.C. Cir. 2003). We review Rule 403 balancing decisions "only for grave

abuse." *Douglas*, 482 F.3d at 596 (internal quotation marks omitted).[2]

**1.**

The district court did not abuse its discretion in concluding that evidence of particular defendants' involvement in uncharged hostage takings was relevant to both how those defendants started to work together as kidnappers, and their motive and intent to kidnap wealthy civilians to extort ransom money. "In a conspiracy prosecution, the government is usually allowed considerable leeway in offering evidence of other offenses" to, for example "inform the jury of the background of the conspiracy charged" or "help explain to the jury how the illegal relationship between the participants in the crime developed." *Mathis*, 216 F.3d at 26 (internal quotation marks omitted); *see Manner*, 887 F.2d at 322. Evidence that defendants jointly engaged in other criminal activity can be relevant to shed light on how the "relationship of mutual trust" developed between those individuals. *See United States v. Escobar-de Jesús*, 187 F.3d 148, 169 (1st Cir. 1999) (collecting cases). The district court admitted the other-crimes evidence as tending to show that a criminal relationship formed between Pierre, De Four, Clarke, and the cooperating co-conspirators during other, uncharged hostage takings. That prior criminal relationship helped to explain how Pierre, De Four, and Clarke knew they could rely on one

---

[2] "[T]he principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged." *United States v. Latney*, 108 F.3d 1446, 1450 (D.C. Cir. 1997) (internal quotation marks omitted). It makes no difference, therefore, that two of the uncharged hostage takings occurred before the Maharaj hostage taking and that one occurred after.

another during the Maharaj hostage taking. The district court did not impermissibly admit evidence of the uncharged hostage takings merely to allow the government to provide the jury with general background information that completed the prosecutor's narrative, *see Bowie*, 232 F.3d at 929, but rather admitted it as tending to establish how the defendants in this case formed the Maharaj hostage-taking conspiracy.

The uncharged hostage takings were also relevant to establish the defendants' state of mind. Information showing that Pierre, De Four, and Clarke had worked closely before on very similar hostage takings helped to dispel any doubt as to whether they knowingly and intentionally joined together to carry out these crimes in order to extract significant ransoms. Intent, knowledge, and motive are "well-established non-propensity purposes for admitting evidence of prior crimes or acts." *Bowie*, 232 F.3d at 930; *see also* Fed. R. Evid. 404(b)(2). As we have previously observed, evidence relevant to intent and motive "is particularly probative where the government has alleged conspiracy." *Mathis*, 216 F.3d at 26 (internal quotation marks omitted). To prove conspiracy to commit hostage taking, the government was required to establish that the conspiracy was knowingly formed and that defendants willfully participated in the plan to commit it with the intent to further some purpose of the conspiracy. *See United States v. Yunis*, 924 F.2d 1086, 1096 (D.C. Cir. 1991). Potential juror doubt about whether any of these three defendants was somehow mistakenly swept up into activities he did not know were part of a criminal conspiracy is powerfully undermined by the evidence of similar criminal teamwork with some of the same people, both before and after the Maharaj hostage taking. Any questions about motive also tended to be put to rest by evidence that the conspirators successfully obtained ransoms in the other, uncharged hostage takings. The district court thus permissibly held that the

other-crimes evidence was relevant for non-propensity purposes.[3]

**2.**

That conclusion does not end our inquiry. Even where other-crimes evidence is relevant for a non-propensity purpose, it nevertheless is inadmissible under Rule 403 if the potential for prejudice from introducing the evidence outweighs its probative value. *See Douglas*, 482 F.3d at 600. We see no reason, however, to disturb the district court's carefully reasoned Rule 403 determination. *See Straker*, 567 F. Supp. 2d at 179. The district judge identified the strong probative value of the evidence for the purposes we have just discussed: to show the defendants' willingness to trust one another and work together to kidnap civilians as a means to extort ransom

---

[3] Defendants also assert that the district court erred by concluding that evidence of the uncharged hostage takings was probative of their modus operandi. We express no view on that question because, even if defendants were correct, it makes no difference here, given that the evidence was properly admitted for other permissible purposes. It is worth noting, however, that the defendants' argument appears to hinge on a misunderstanding of the district court's opinion. Defendants point to the district court's discussion of ways in which the other hostage takings were similar to the charged offense, and its observation that they were all close in time. *Straker*, 567 F. Supp. 2d at 178. The district court did not thereby hold that the evidence was admissible to show a similar modus operandi in both the charged and uncharged offenses. That part of its analysis instead related to whether the evidence of the uncharged hostage takings met the "threshold level of similarity" to the charged hostage taking, without which it could not have admitted the evidence as relevant to defendants' intent, motive, and knowledge. *See id.* (citing *Long*, 328 F.3d at 661); *see also Manner*, 887 F.2d at 321.

money. The danger of unfair prejudice was minimal because the other-crimes evidence added "'no emotional or other pejorative emphasis not already introduced by the evidence'" of the crime charged in this case. *Id.* (quoting *Lawson*, 410 F.3d at 742). Indeed, the facts of this kidnapping are significantly more damning because, unlike the uncharged other crimes the judge allowed the prosecution to establish, this one went awry. After defendants held their victim, an American citizen, hostage for seven days without necessary diabetes medication, he died. Several defendants then dismembered his body with a machete and packed the pieces in two large coolers in an effort to conceal their crime.

The district court effectively barred cumulative evidentiary presentations and used safeguards to minimize any potential prejudice from the admission of the other-crimes evidence. In addition to limiting the number of other crimes about which the prosecution could introduce evidence, and strictly rationing the trial time allowed for those evidentiary presentations, *Straker*, 567 F. Supp. 2d at 179; *see also* J.A. 961–62; J.A. 3171–72, the court paid careful attention to the nature of the testimony that was introduced and prevented the government from soliciting testimony about particularly prejudicial details. *See* J.A. 3462–66; J.A. 3686–88. The court excluded all evidence of two uncharged hostage takings, including the one that raised the greatest risk of unfair prejudice. As already noted, the evidence in that kidnapping suggested that the captors intentionally killed their hostage in response to an insufficient ransom offer, *see Straker*, 567 F. Supp. 2d at 179—a response arguably even more brutal than the deprivation of life-sustaining medication that led to the predictable demise of the victim in this case.

Defendants further argue that the uncharged hostage-takings evidence was "wholly unnecessary" to the

government's case, such that any minimal probative value was substantially outweighed by the prejudice it caused, in violation of Rule 403. Defendants find unpersuasive the theories discussed above, regarding the probativeness of the other-crimes evidence to questions of relationship, motive, and intent; they contend that the government had ample, less prejudicial ways to make the same points. Defendants contend that the evidence was unnecessary to show their relationships, given other evidence that the defendants formed friendships in boyhood or during military service. That evidence, however, does not speak to their repeated experience of trusting one another to carry through with felonious conspiracies without revealing their activities to law enforcement. Defendants also contend that the evidence of the uncharged hostage takings was unnecessary to show their intent or motive because they did not raise innocent-motive defenses. That argument ignores the government's burden, regardless of the nature of the defense, to prove beyond a reasonable doubt that defendants knowingly and intentionally joined the conspiracy to kidnap Maharaj. *See Douglas*, 482 F.3d at 597; *Old Chief v. United States*, 519 U.S. 172, 187–88 (1997). In sum, the district judge's careful sorting of the other-crimes evidence and the limitations he placed on how much other-crimes evidence the prosecution could use successfully allowed the evidence which was most probative while avoiding unfair prejudice. The district court did not abuse its discretion by refusing to exclude the evidence of the uncharged hostage takings under Rule 403.

**3.**

Lastly, we turn to defendants' argument that the government presented evidence of the uncharged hostage takings in such a "disorganized and confusing fashion" that they were prejudiced. Def. Br. 56 (citing *United States v.*

*Sampol*, 636 F.2d 621, 645 (D.C. Cir. 1980); *United States v. Foskey*, 636 F.2d 517, 524 n.6 (D.C. Cir. 1980)). As we discuss more fully, *infra*, in connection with the post-trial severance motion, the district court concluded that the jury was able to correlate the evidence with each defendant against whom it was properly introduced, and to avoid spillover consideration of evidence against defendants to whom it did not relate. *See Clarke*, 767 F. Supp. 2d at 26–27. Defendants have failed to persuade us that the district court abused its discretion in so concluding. The government presented evidence about the other hostage takings, in part through testimony of cooperating co-conspirators who spoke about some of the uncharged offenses before describing the charged offense in greater detail. Because the cooperating co-conspirators generally testified about the hostage takings in chronological order and each hostage taking involved a different victim, the jury was provided with clear guideposts with which to differentiate and compartmentalize each event.

The district court repeatedly and carefully instructed the jury as to which defendants were involved in which of the other crimes, and cautioned the jurors to consider evidence only against those specific defendants, thereby protecting all of the defendants against any potential confusion stemming from the other-crimes evidence. *See Long*, 328 F.3d at 662 ("[L]imiting instructions ordinarily suffice to protect the defendant's interests." (citing *Spencer v. Texas*, 385 U.S. 554, 561 (1967)). The court gave limiting instructions concerning the evidence of other hostage takings six times throughout the course of the trial: after opening statements, the first time that the other-crimes evidence was introduced by the government, at several points during the trial, and as part of the final jury instructions. In the various instructions, the court cautioned the jury that the evidence of the uncharged hostage takings was admissible for only limited purposes: informing the jurors of

the background of the conspiracy, helping them decide whether there were relationships between the co-conspirators, and aiding their determinations as to whether the defendants had motive, intent, knowledge, or a plan to commit the Maharaj hostage taking. The court also made clear that the other-crimes evidence was admissible only against the particular defendants the jurors found were involved in those other crimes, alternating between specifically naming the defendants involved in the other hostage takings and generally referring to those defendants. Juries are presumed to follow instructions that caution them to draw only permissible inferences from Rule 404(b) evidence. *See United States v. Brown*, 597 F.3d 399, 405–06 (D.C. Cir. 2010). The district court's detailed instructions guided the jurors to compartmentalize and properly consider the evidence of uncharged hostage takings.

Defendants have identified a handful of examples where the district judge expressed some confusion regarding the presentation of evidence of the uncharged hostage takings. In several instances, the district court identified potential confusion only to reinforce to the prosecution the importance of making clear to the jury which hostage taking the witness was discussing. Several references to confusion were made during bench conferences out of the jury's hearing. The record portions on which defendants rely demonstrate not that the evidence was presented in a misleading fashion, but rather that the district court took great care to reduce the potential for confusion. The isolated examples of confusion identified by defendants do not show that the other-crimes evidence was so unclear or misleading that the jury was unable to follow the district court's limiting instructions.

Defendants claim the government's closing argument intensified confusion about the other-crimes evidence by

stating that the same "crew" or "organization" carried out all of the hostage takings, and that Pierre was the "godfather" of the crew. Contrary to defendants' characterization, however, no prosecutor argued that Pierre's crew committed all of the hostage takings. The government's closing did refer to the "crew" or group of individuals involved in the Maharaj hostage taking. The government also argued that Pierre was involved in all of the hostage takings, and indeed was in charge during each of those hostage takings. The evidence presented at trial supported each of those points. What the government did not assert was that Pierre led the same crew in each instance, and the trial evidence and judge's instructions protected against any such conclusion.[4]

For all of these reasons, we conclude that the district court acted within its sound discretion in admitting at trial evidence about three uncharged hostage takings.

---

[4] For similar reasons, the argument that the proof at trial represented a material variance from the indictment, even if preserved below, is meritless. Even if we were to assume that the trial evidence in this case materially varied from the indictment (and the defendants give us little reason to think that is the case), the defendants nonetheless cannot show the requisite substantial prejudice. Given the focused and limited nature of what was actually argued or established regarding other incidents involving groups led by Pierre and the district court judge's careful limiting instructions, it simply was not the case that the jury here was "substantially likely" to consider against the defendants evidence of a RICO conspiracy not charged in the indictment. *See United States v. Celis*, 608 F.3d 818, 845-46 (D.C. Cir. 2010).

**IV.**

**Confrontation Clause Challenge to Use of
Codefendants' Statements**

Defendants next contend that the district court violated their Sixth Amendment rights to confront the witnesses against them when it admitted into evidence redacted confessions made by their fellow defendants that inculpated them in the Maharaj hostage taking.[5] We conclude that the admission of the redacted confessions did not violate the Confrontation Clause, with the exception of the violation acknowledged by the government, which, in view of the independent and overwhelming evidence in support of the conviction, was harmless.

**A.**

The conspiracy was alleged to have involved at least a dozen men, seven of whom were tried jointly in this case. After they were arrested, five of the defendants gave statements to law enforcement officials confessing their own

---

[5] In a footnote, all defendants, save Straker, seek to join this argument. Def. Br. 60 n.27. As discussed *supra* note 1, adoption by reference is permitted only to the extent we can readily apply the proponent's arguments to the adopter's case. Some of the defendants' Confrontation Clause arguments are purely legal and can readily be adopted. Others are fact-specific, rendering adoption by reference inappropriate. Clarke, Demerieux, and Nixon have made fact-specific arguments that explain how they believe their constitutional rights were violated by the introduction of their codefendants' out-of-court statements. We therefore limit our consideration of defendants' fact-specific arguments to those particular defendants.

participation in the Maharaj hostage taking. Before trial, the government filed a notice of its intent to introduce at trial the out-of-court statements made by codefendants Clarke, Demerieux, and Sealey. [6] Defendants objected on Sixth Amendment grounds to the admission of the statements and also moved to sever their trials. The district court concluded that separate trials would not be necessary because each statement could be adequately redacted and other safeguards used in order fully to protect the non-declarant defendants' Sixth Amendment confrontation rights. The district court ordered the government to redact the statements to remove references identifying defendants other than the declarant whenever possible. When full redaction was not possible, the court instructed the government to replace a particular name with a neutral term, sufficient to "avoid creating an inevitable association with a particular defendant or defendants when the statement is viewed together with other evidence." J.A. 2079. The court also provided the government with a detailed set of guidelines, recounted below, specifying the types of neutral terms that would be acceptable and those that would not, along with other safeguards of defendants' confrontation rights.

---

[6] The government introduced ten confessions made by five different defendants. Two of those defendants, De Four and Straker, testified at trial. Defendants cannot raise Confrontation Clause challenges to the admission of those pretrial statements, as they had the opportunity to subject De Four and Straker to cross-examination. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). Furthermore, none of the defendants identifies any statements or redactions in those confessions that implicated him. On appeal, therefore, we focus on defendants' arguments concerning the introduction of Clarke, Demerieux, and Sealey's confessions.

**B.**

Defendants contend that the use of neutral-pronoun redactions was inadequate, and that the Confrontation Clause instead demands full redaction of codefendants' confessions to eliminate any reference to fellow defendants that jurors might infer to be references to non-declarant defendants. *See Richardson v. Marsh*, 481 U.S. 200 (1987). Alternatively, redactions used here were inadequate because, defendants claim, when a redacted confession was considered alongside the other evidence presented at trial, it inevitably pointed an inculpatory finger at a particular defendant, contrary to *Gray v. Maryland*, 523 U.S. 185 (1998).

The government responds that the Confrontation Clause does not require removal of all references to defendants, anonymized as the remaining references were, and that full redaction would have substantially diminished the value of the statements against the declarants themselves. Full redactions were not always practicable in this case, the government contends, because the declarants were charged with conspiracy. Eliminating from their statements all references to their co-conspirators jointly on trial would have "deprived the government of powerful conspiracy evidence" that it was entitled to use. Gov't Br. 94.

We review *de novo* the district court's legal conclusions under the Confrontation Clause, *United States v. Wilson*, 605 F.3d 985, 1003 (D.C. Cir. 2010), and subject to harmless-error analysis any legal errors it may have made, *United States v. Moore*, 651 F.3d 30, 69 (D.C. Cir. 2011).

**1.**

The Confrontation Clause of the Sixth Amendment provides a criminal defendant with the right "to be confronted

with the witnesses against him," including the right to cross-examine those witnesses. U.S. Const. Amend. VI; *see Pointer v. Texas*, 380 U.S. 400, 404 (1965). Use of a defendant's own confession against him raises no confrontation issues. The admission of a codefendant's confession implicating another defendant, however, poses special risks to the defendant's confrontation rights. When the declarant expressly implicates another defendant yet renders himself unavailable for cross examination by asserting his Fifth Amendment right not to testify, use of his statement violates the defendant's right to confront his accuser. *See Bruton v. United States*, 391 U.S. 123, 137 (1968). But at least when (1) the jury is instructed to consider the confession against the declarant only, and (2) redactions are made such that the statement, together with other trial evidence, neither expressly identifies defendants nor creates any inevitable association between them and the criminal activity the statement describes, there is no Sixth Amendment violation. *See Richardson*, 481 U.S. 200, 211; *United States v. Washington*, 952 F.2d 1402, 1406–07 (D.C. Cir. 1991).

The framework for analyzing limitations on use of codefendants' statements is established by a trilogy of Supreme Court Confrontation Clause cases: *Bruton*, 391 U.S. 123, *Richardson*, 481 U.S. 200, and *Gray*, 523 U.S. 185. The district judge who presided over defendants' joint trial in *Bruton* admitted into evidence a non-testifying codefendant's confession incriminating the defendant. 391 U.S. at 124. The Supreme Court found a Sixth Amendment violation, overruling a prior decision sustaining a conviction in similar circumstances, because that precedent placed unwarranted confidence in the efficacy of limiting jury instructions. *Id*. at 126 (overruling *Delli Paoli v. United States*, 352 U.S. 232 (1957)). The *Bruton* Court acknowledged that it is unrealistic to expect a jury to rely on a statement when deciding the guilt

of the confessing codefendant, yet ignore the same statement when considering the guilt of the defendant it mentions as an accomplice. *Id.* at 131, 135–36. Justice Stewart summed up the inadequacy of limiting jury instructions in such settings: "A basic premise of the Confrontation Clause . . . is that certain kinds of hearsay are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, *whatever* instructions the trial judge might give." *Id.* at 138 (Stewart, J., concurring) (internal citation omitted).

The Court has since established that non-testifying codefendants' statements may be introduced at joint trials if sufficient redactions can be made and adequate jury instructions given to protect the rights of codefendants. In *Richardson*, the codefendant's confession was fully redacted to eliminate all references to the defendant. 481 U.S. at 203. The confession only implicated the defendant when it was considered alongside her own testimony, placing her at the scene of a critical conversation the confession described. *Id.* at 205–06, 208. The Court found no Confrontation Clause violation in *Richardson* because the statement was "not incriminating on its face," but became potentially incriminating "only when linked with evidence introduced later at trial." *Id*. at 208. Even then, the inference was not obvious, such that the limiting jury instructions sufficed to guard against the remaining risk of "inferential incrimination." *Id*. In contrast to the "[s]pecific" and "vivid" incriminating statement at issue in *Bruton* that created an "overwhelming probability" that jurors would fail to heed limiting instructions, *id.* at 208–09, the redacted statement in *Richardson* made any incriminating implication sufficiently indirect that jury instructions could be counted on to "dissuad[e] the jury from entering onto the path of inference in the first place." *Id.* at 208.

The adequacy under the Confrontation Clause of redacting a non-testifying codefendant's statement depends on how effectively the redaction eliminates the statement's accusatory implication.   Evaluations of such effectiveness are necessarily contextual.   In *Gray v. Maryland*, the prosecution only crudely redacted a codefendant's statement by whiting out the names of Gray and the other alleged perpetrator (who had since died), leaving blank spaces separated by commas.   523 U.S. at 188.   The police witness reading to the jury from the confession said "deleted" or "deletion" each time he encountered a blank.   *Id.*   Such redaction did little, if anything, to cure the prejudice to the defendant.   The Court determined that the "blank space in an obviously redacted confession . . . points directly to the defendant, and it accuses the defendant in a manner similar to [the non-testifying codefendant's] use of Bruton's name or to a testifying codefendant's accusatory finger," and thus requires the same result as in *Bruton*.   *Id.* at 194.   Even though the redacted confession in *Gray* never named the defendant on trial, it called the jurors' attention to his codefendants' inculpation of him with sufficient clarity that no limiting jury instruction could suffice.   The difference in outcomes in *Gray* and *Richardson* depended "in significant part upon the *kind* of, not the simple *fact* of, inference."   *Id.* at 196.   *Gray* "involve[d] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial," *id.*, whereas the inferences in *Richardson* were attenuated.

The Supreme Court has not yet determined the permissibility under the Sixth Amendment of the type of redaction at issue here, which eliminated names and identifying references to specific defendants (without signaling that changes had been made), but left intact some of the statements' descriptions of people doing things to advance the crimes with which the defendants were charged.   Indeed, the

Court in *Richardson* was careful to note that it "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun."  481 U.S. at 211 n.5.  The redactions in this case fall somewhere between the full redaction that *Richardson* sustained, and the obviously inculpatory blank spaces and deletions that *Gray* held to be insufficient.  The Court has, however, hinted how redactions might effectively be used in cases involving several perpetrators:  In disapproving the obvious redactions in *Gray*, the Court noted that the incriminating references to "Me, deleted, deleted, and a few other guys" could have been changed to "Me and a few other guys."  523 U.S. at 196.

Our circuit has infrequently considered the kind of neutral-pronoun redactions approved by the district court in this case.  Evaluation of the potential inculpatory implications of a non-testifying codefendant's redacted confession is necessarily contextual.  We have held that putatively anonymized references to a defendant in a codefendant's statement violated *Bruton* where the statement still called attention to the declarant's accusation against the defendant. *See Serio v. United States*, 401 F.2d 989, 990 (D.C. Cir. 1968) (per curiam).  Elsewhere, we found neutral-pronoun redaction constitutionally adequate where, describing a transaction in which several people were involved, a statement was redacted to replace the defendant's name with neutral pronouns that, in context, did not inevitably refer to the defendant.  *See Washington*, 952 F.2d at 1406; *see also United States v. Applewhite*, 72 F.3d 140, 145 (D.C. Cir. 1995).

*Serio*, a case we decided immediately after *Bruton* and that, like *Bruton*, involved just two alleged perpetrators, held that the admission of a codefendant's confession in which the defendant's name was replaced with the phrase "another man"

violated the defendant's confrontation right because of the "well-nigh inevitable association of [the defendant] as the 'other man' referred to in [his codefendant's] confession." 401 F.2d at 989–90. After *Richardson* but before *Gray*, however, we sustained in *Washington* the use of nonobvious, neutral-pronoun redaction together with limiting jury instructions in circumstances in which the redacted statement could have referred to several individuals other than the defendant. 952 F.2d at 1406. In that context, the neutrally redacted statement created no "inevitable association" between the defendant and the inculpatory conduct the statement describes. *Id.* (citing *Serio*, 401 F.2d at 990). *Washington* questioned whether *Serio*'s "inevitable association" standard might be more protective of defendants' rights than the Sixth Amendment requires, but left that matter undecided because that challenge failed even under *Serio*. *Id.* Here, too, we see no need to consider whether *Serio* is overprotective, because that standard was satisfied here.

In sum, at least when "all references to the defendant in a codefendant's statement are replaced with indefinite pronouns or other general terms, the Confrontation Clause is not violated by the redacted statement's admission if, when viewed together with other evidence, the statement does not create an inevitable association with the defendant, and a proper limiting instruction is given." *Washington*, 952 F.2d at 1406–07. In such circumstances, provided that the jury is instructed not to consider the codefendant's statements as evidence against anyone but the declarant himself, as happened here, *Bruton* is not violated.[7]

---

[7] Our approval of the use of neutral pronouns and other general terms accords with that of other circuits. *See, e.g.*, *United States v. Vasilakos*, 508 F.3d 401, 407–08 (6th Cir. 2007) (collecting federal

**2.**

In their *Bruton* challenge, defendants first argue that the district court erred by failing to require the government to redact fully the codefendants' confessions to eliminate even anonymized references to other perpetrators. They assert that neutral-pronoun redactions do not adequately protect defendants' confrontation rights because they leave in place inevitable associations with the defendants. In their view, only full redaction would suffice. Defendants further contend that, even if the Sixth Amendment permits jurors to hear anonymized references to defendants' criminal activity, the redactions here were inadequate. The sheer number of redactions, combined with grammatical errors in redaction, they claim made it clear to the jury in this case that the confessions were altered, and thus impermissibly pointed the finger at them.

We do not accept the defendants' claim that anything short of full redaction violates their confrontation rights. The prosecution made full redactions in several places where it could do so without creating unacceptable confusion or distortion. But, as *Washington* makes clear, the Confrontation Clause does not always mandate full redactions. Carefully made neutral-pronoun redactions can avoid the defect of elisions so crude that they "obviously refer directly to someone, often obviously the defendant." *Gray*, 523 U.S. at 196. The critical question is whether the redactions adequately conceal the fact that the declarant identified the defendant in particular—a fact that, if known, would make it

appellate decisions); *see also United States v. Ramos-Cardenas*, 524 F.3d 600, 608–09 (5th Cir. 2008); *United States v. Vega Molina*, 407 F.3d 511, 519–21 (1st Cir. 2005); *United States v. Sutton*, 337 F.3d 792, 799–801 (7th Cir. 2003).

unlikely that a jury would be able to follow a limiting instruction. *See id.*

Viewing the text of the statements as a whole and in the context of the facts and evidence in the case, we disagree that the redactions made it obvious that the statements referred to specific defendants. The neutral-pronoun redactions here were a far cry from those in *Gray*, where the method of redaction only strengthened the inference that the Confrontation Clause required be attenuated. Despite the need for frequent redactions in this case, each resulting statement resembled a confession that a defendant might have made if he were trying to avoid identifying his co-conspirators. A defendant endeavoring not to point the finger at his confederates would need repeatedly to rely on the kinds of vague references, such as "them" and "the other guy," that these redacted statements use. In fact, even before his statement was redacted, Clarke referred to his co-conspirators as "fella" or "fellas" six times in two transcript pages. The government noted such speech patterns, making efforts when crafting the redactions to mimic the speaker's own language patterns and word choices to make the redactions inconspicuous. The single, ungrammatical redaction identified by defendants—in which Clarke's statement erroneously omitted a definite article before referring to "other guy"—did not make it obvious that the statement had been redacted: the awkward language could just as plausibly have resulted from a misstatement (by either the declarant or testifying officer) or typographical error in transcribing the confession.

Defendants also contend that the confessions, redacted as they were, violated their confrontation rights because, when considered alongside the other evidence presented at trial, the confessions created inevitable inculpatory associations with

particular defendants. When a confession is redacted with neutral pronouns, a jury, after hearing all of the evidence presented in the case, may still very well be able to draw inferences that the "other guy" mentioned in the confession was actually one of the defendants. *Bruton* is not violated, however, whenever a jury may be able to draw such an inference. Instead, it is violated when the inferences are so strong and obvious that a jury cannot be expected to follow limiting instructions. *See Gray*, 523 U.S. at 196.

The evidence identified more than a dozen different men involved in the crimes charged in this case, making it unlikely that the jury would readily link a statement's mention of a "person" or "guy" to a specific defendant. *See Washington*, 952 F.2d at 1406; *see also United States v. Vasilakos*, 508 F.3d 401, 408 (6th Cir. 2007); *United States v. Vega Molina*, 407 F.3d 511, 520 (1st Cir. 2005); *United States v. Sutton*, 337 F.3d 792, 799 (7th Cir. 2003). There were seven defendants standing trial and four cooperating co-conspirators who testified against them, plus several unindicted individuals whom the cooperators implicated in the hostage taking, not to mention the participants in the other kidnappings admitted into evidence, whom the jury could not be sure played no role in this case. To further attenuate any inculpatory inference, Clarke's redacted statements repeatedly referred to someone named "Igloo," an apparently fictitious character made up by Clarke, to whom he ascribed the actions of several different members of the conspiracy. Because of the number of identified participants, the statements, redacted as they were and accompanied by limiting instructions, supported no "inevitable association" between the persons described and any of the alleged co-conspirators standing trial, let alone a particular defendant.

Defendants contend that the redacted statements impermissibly identified them because of the recognizable roles they played in the crime. Clarke and Demerieux acted as guards at the camp, and Sealey and Nixon were the gunmen who abducted Maharaj from the bar. Each of Clarke and Demerieux's redacted statements refers to the "other guy" or "another fella" at the camp with the victim. Sealey's redacted statement refers to himself and "the other man" abducting the victim. Defendants argue that, despite those redactions, the jury would inevitably associate each of them with a particular, unnamed "guy" or "fella" based on other trial testimony: Cooperators Jason Percival and Russel Joseph both stated that Clarke and Demerieux were at the campsite for the vast majority of the time between when Maharaj was abducted and when he died, and, in testifying that they were present when the victim was abducted, they identified Sealey and Nixon as the men who entered the bar and abducted Maharaj.

The discernible roles some defendants played were not so clear and exclusive as defendants contend, however, but often overlapped with the activities of other defendants and co-conspirators. For example, the evidence showed that, when Clarke and Demerieux were guarding the hostage at the camp, there were often other men, whether defendants or cooperating co-conspirators, present at the campsite. In light of the multiple comings and goings at the campsite, any reference to someone else there did not obviously refer to Clarke or Demerieux.[8] Similarly, although the testimony showed that Sealey and Nixon were the two gunmen who

---

[8] Clarke and Demerieux also argue that because their statements were interlocking and reinforced one another, it furthered the inevitable association. Given our conclusion the redactions obscured the references to each man in the other's statement, we disagree that the statements were interlocking.

abducted Maharaj from the bar, it also showed that many other people were at the scene of the abduction or involved in the getaway. Accordingly, even in light of the evidence introduced at trial concerning each defendant's role in the hostage taking, anonymized references to the "other guy" or "another fella" in the confessions avoided creating an inevitable association between a confession and any particular complaining defendant.

Inevitable associations were not created, in large part, because the district court established guidelines for redaction, and closely supervised the redaction process in order to ensure that the admission of the confessions at trial did not violate *Bruton* and its progeny:

> *First*, the trial judge required full redactions where feasible without distorting the statement's meaning. *See Richardson*, 481 U.S. at 211.

> *Second*, when it was impossible to redact fully a portion of a confession, the district court directed the government to use only non-obvious, partial redactions, replacing the defendants' proper names or nicknames with a variety of neutral pronouns to make the resultant statements appear natural and match the defendants' own speech.

> *Third*, the court required that the statements be scrubbed of any other designations or identifiers based on a defendant's physical characteristics or role in the hostage taking (such as driver or guard). *See Harrington v. California*, 395 U.S. 250, 253 (1969); *United States v. Nash*, 482 F.3d 1209, 1218 (10th Cir. 2007); *United States v. Hoover*, 246 F.3d 1054, 1059 (7th Cir. 2001).

*Fourth*, the court directed that redactions avoid referring to specific numbers of persons, in order further to weaken the jury's ability to correlate the statements' references to unnamed individuals with members of otherwise-identified pairs or clusters of defendants.

*Fifth*, the court reviewed drafts of the prosecution's redacted statements and required additional changes to conform them to the court's *Bruton* guidelines. That safeguard helped to avoid clumsiness in redactions that could have been inculpatory.

*Sixth*, by only allowing prosecution witnesses to use the statements to aid in their testimony without admitting the documents themselves into evidence, the court ensured that the jury did not see written (and perhaps discernibly altered) copies of the redacted confessions.

*Finally*, and perhaps most importantly, the district court recognized that redactions would be effective to protect defendants' confrontation rights because of the large number of actors involved in the alleged crime. As the court observed, the greater the number of alleged perpetrators involved in the charged offense, the more indirect the inference that the jury could draw from the redacted statements.

Given the context of this case and the care the district court took regarding use of codefendants' redacted statements, any inferences created by the statements were attenuated. Defendants do not contend, nor do we believe based on our review of the record, that a jury could from a statement alone

immediately make a connection between a specific defendant and one of the "guys," "fellas," or other people the statement mentions. When considered along with the other evidence presented at trial and with appropriate limiting instructions, the redacted confessions introduced here created no inevitable association between the persons the declarants described and particular defendants.[9]

For all of these reasons, we conclude that the redacted statements admitted into evidence at defendants' trial did not violate *Bruton*.

---

[9] Defendants also argue that the Supreme Court's decision in *Crawford*, should increase the skepticism with which we review *Bruton* claims. *See* 541 U.S. 36. *Crawford* announced a general rule of inadmissibility of out-of-court statements by witnesses who are unavailable and so not subject to cross-examination. The Court there dealt with statements that, unlike the statements here, were not otherwise admissible as codefendant confessions. The *Crawford* Court held that the admissibility against a defendant of a testimonial statement by a non-testifying declarant depends, not merely on the statement's reliability, but on whether the defendant had a prior opportunity to cross-examine the declarant, because the Confrontation Clause establishes "that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61. *Crawford* applies to statements admitted against a defendant; a statement that has been effectively *Bruton*-ized, however, is one that has been redacted so that it can, with appropriate limiting jury instructions, be deployed *only* against the declarant and *not* against the objecting codefendant. *See Bruton*, 391 U.S. at 135–36; *see also Richardson*, 481 U.S. at 206. *Crawford* accordingly does not apply here, where we have determined that the statements are admissible under the *Bruton* line of cases because, properly used, they create no inevitable inculpating association with defendants.

43

**3.**

Finally, we conclude that the error acknowledged by the government—cooperating co-conspirator Leon Nurse's use of Nixon's name while testifying about the contents of an out-of court confession made by Sealey—was harmless. A *Bruton* error does not necessarily require reversal, because "[i]n some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida*, 405 U.S. 427, 430 (1972). This is such a case.

At trial, cooperator Nurse testified that, when he and Sealey were incarcerated pending trial, Sealey told Nurse about his participation in the kidnapping. Nurse had been instructed for his testimony regarding Sealey's out-of-court statement not to refer to any other defendant by name, but violated that instruction by naming Nixon when recounting Sealy's confession. Nurse recounted that Sealey "said at the scene—at the scene of the kidnapping, [s]ir, he said that Mr. Nixon didn't really want to come out of the—." *Clarke*, 767 F. Supp. 2d at 35. Recognizing the error, the district court immediately instructed the jury to disregard that piece of testimony. The government concedes that was a *Bruton* violation.

The error was harmless beyond a reasonable doubt in view of its limited inculpatory value and the ample other evidence of Nixon's guilt presented during the ten-week trial. Nurse used Nixon's name only a single time. That single, explicit reference merely placed Nixon at the scene of the hostage taking, and did not describe his ensuing actions. In comparison to that isolated utterance, the other evidence of

Nixon's guilt was overwhelming. Cooperators Joseph and Percival each testified in detail about Nixon's involvement in the hostage taking. Joseph testified that he drove Nixon and Sealey to the bar where Maharaj was abducted, that Nixon was armed, and that Nixon entered the bar and moments later returned with Sealey and the victim. After Nixon and Sealey forced Maharaj into the back of the getaway car, Joseph stated, he drove the group to a cocoa field and Nixon and Sealey led the victim into the field and left him there. Joseph further recounted that he and Nixon later returned to move Maharaj from the cocoa field to the campsite where Clarke and Demerieux guarded him. Cooperator Percival's testimony closely paralleled and reinforced Joseph's account. Both men also testified that, during the abduction, Nixon wore a Rasta hat, a detail that was corroborated by an eyewitness who did not participate in the abduction. Given the overwhelming evidence of Nixon's guilt, Nurse's single reference to Nixon was harmless beyond a reasonable doubt.

## V.

### *Brady/Napue* **Claim**

The Constitution's "fair trial guarantee," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), requires the prosecution to timely turn over any information in the government's possession that is materially favorable to a criminal defendant, *Brady v. Maryland*, 373 U.S. 83 (1963), and forbids the prosecution's introduction of false testimony, *Napue v. Illinois*, 360 U.S. 264 (1959). Those are grave obligations, grounded in both the Fifth and Sixth Amendments to the Constitution. *See Ruiz*, 536 U.S. at 628.

Six of the defendants—Clarke, De Four, Nixon, Sealey, Demerieux, and Pierre—argue that the prosecution violated

both *Brady* and *Napue*. Specifically, those defendants object that Agent William Clauss's and Sergeant Wendell Lucas's testimony misleadingly implied that Clarke led them to the campsite where Maharaj had been held, when in fact Clarke led them to another location. The defendants also argue that the prosecutors violated both *Brady* and *Napue* when they elicited testimony from Percival indicating that Demerieux "hit the man [*i.e.*, Maharaj] in his head with a big stone and dent his head," even though available x-ray evidence revealed no such head injury. Lastly, the defendants argue that the prosecution breached its *Brady* obligations when it failed timely to turn over cooperator Russell Joseph's initial confession, which identified someone other than De Four as a driver in the kidnapping.[10]

The prosecution's behavior leaves much to be desired, falling far short of this court's expectations. Nevertheless, each of the defendants' claims ultimately fails on the merits.

A *Brady* violation occurs when the prosecution (i) fails to disclose to the defense, whether willfully or inadvertently, (ii) exculpatory or impeachment evidence that is favorable to the accused, and (iii) the withholding of that information

---

[10] Before the district court, Clarke and Demerieux moved for a new trial based on the campsite issue; Demerieux moved for a new trial based on the x-ray evidence; and De Four and Sealey moved for a new trial based on the Joseph confession. The other defendants did not raise or join those individual claims below, and so review as to them is for plain error only. *See United States v. Johnson*, 437 F.3d 69, 74 (D.C. Cir. 2006). Moreover, because the defendants' brief addresses the *Brady* and *Napue* claims only as they specifically relate to Clarke, Demerieux, and De Four, all of the other defendants on each claim have failed to make even a plausible argument for relief, so their arguments fail at the starting gate.

prejudices the defense. *See United States v. Andrews*, 532 F.3d 900, 905 (D.C. Cir. 2008) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)); *see also Brady*, 373 U.S. at 87. When, as here, disclosure by the prosecution happened late rather than not at all, the defendant must show a "reasonable probability that an earlier disclosure would have changed the trial's result" to establish prejudice. *United States v. Dean*, 55 F.3d 640, 663 (D.C. Cir. 1995); *see also United States v. (Ralph) Wilson*, 160 F.3d 732, 742 (D.C. Cir. 1998) (defendant bears burden of proving "reasonable probability"). In this context, a "reasonable probability" means "a probability sufficient to undermine our confidence in the actual outcome that the jury would have acquitted." *United States v. Tarrantino*, 846 F.2d 1384, 1417 (D.C. Cir. 1988).

The district court denied each of the *Brady* claims. The government argues that the ruling should be reviewed only for clear error, reasoning that "[t]he clearly erroneous standard ordinarily governs review of a judge's findings in a criminal case on issues other than the defendant's guilt," including review of a district court's "conclusion that [the defendant] suffered no prejudice by his late access to the evidence[.]" *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988) (first alteration in original). Since *Paxson* was decided, however, the Supreme Court has clarified that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. That prejudice element requires an inquiry into "material[ity]," *Andrews*, 532 F.3d at 905, and materiality under *Brady* is a "question of law," subject to *de novo* review, *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007). Accordingly, our review is *de novo*.

A *Napue* violation occurs when the government introduces false or misleading testimony or allows it to go uncorrected, *see Giglio v. United States*, 405 U.S. 150, 153 (1972), even though the government knew or should have known that the testimony was false, *see, e.g.*, *United States v. Agurs*, 427 U.S. 97, 103 (1976). If a defendant makes that showing, a new trial is required if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury[.]" *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003) (quoting *Agurs*, 427 U.S. at 103).

Because none of the *Napue* violations asserted on appeal was raised below, we review for plain error, reversing only if we perceive that "(1) there is error (2) that is plain and (3) that affects substantial rights, and (4) . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 437 F.3d at 74 (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)).

**A.**

At trial, both Agent Clauss's and Sergeant Lucas's testimony misleadingly indicated that Clarke led them to the campsite where Maharaj was held. But, in fact, Maharaj was never held at that campsite, and the government knew the testimony was misleading at the time it was given. The government nevertheless chose not to reveal that to the defense until the overnight recess *after* the defense cross-examination of Agent Clauss, when it faxed a diagram of the campsite with a cover memo stating it was "believed to be Clauss diagram from false campsite." J.A. 3936–38. The prosecution admitted that "[w]e knew, the government knew that this was not going to be the right campsite." J.A. 3945.

The district court found both that "the government knew" all along that the testimony was about a false campsite, and that the testimony misled the court ("I know I didn't know it"), and "confused" the jury. J.A. 3964–65. The district court nevertheless denied the motion for a new trial because, "notwithstanding the government's failure to disclose the evidence earlier, Clarke was able to incorporate it into his defense." *Clarke*, 767 F. Supp. 2d at 53.

The government's use of knowingly misleading testimony that confuses the court, jury, and defense alike, compounded by its greatly delayed release of information revealing the deceptive content, is deeply disappointing and troubling behavior, unbefitting those who litigate in the name of the United States. *See, e.g.*, *United States v. Ash*, 413 U.S. 300, 319 (1973) ("The primary safeguard against abuses of [the prosecutorial process] is the ethical responsibility of the prosecutor, who, as so often has been said, may 'strike hard blows' but not 'foul ones.'") (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

But prosecutorial misbehavior alone does not a *Brady* violation make. A reasonable possibility of concrete prejudice from the false testimony or the delayed disclosure must be shown. That has not been demonstrated here. Moreover, the testimony was corrected, and Clarke failed to demonstrate that the misleading content of the initial testimony could nevertheless have affected the judgment of the jury. Clarke's *Napue* challenge thus also fails.

To begin with, all parties agreed on a stipulation to be read to the jury exposing the government's misleading presentation:

> The parties, meaning the government, the United States of America, and Mr. Clarke, stipulate and agree that the

campsite that FBI Agent Clauss and Sergeant Lucas testified about that was visited by Zion Clarke in the custody of law enforcement personnel on January 6, 2006, was not a location to where Mr. Maharaj was ever taken or at which he was ever held.

J.A. 4713–14.

That stipulation dispelled the confusion and set the groundwork for defense arguments countering the testimony. Indeed, it was materially indistinguishable from Clarke's proposed curative instruction to the jury. [11] The only difference is that the stipulation did not include the phrase "it is now conceded by the government." The defendants, however, have not demonstrated how the omission of that single phrase could have had any material impact on the jury's consideration of all the relevant evidence presented in the case. Clarke's counsel, moreover, used that stipulation in closing arguments to attack Agent Clauss and Sergeant Lucas' credibility. The jury thus was fully aware that both agents had misled them, and that the campsite to which Clarke had led law enforcement was not, in fact, a crime scene. That left the jury free to draw whatever inference it found more persuasive from Clarke's actions.

Defendants object that earlier disclosure would have permitted a more thoroughgoing presentation of a defense theory that Clarke led police to the wrong campsite precisely because he was not involved in the actual crime. But

---

[11] Clarke's counsel proposed the following stipulation: "[Y]ou heard testimony yesterday that Zion Clarke led agents to the campsite where Mr. Maharaj was held. It is now conceded by the government that that was not the campsite where Mr. Maharaj was held." J.A. 3963.

defendants identify no evidence that Clarke was unable to present or any argument that he was precluded from making as a result of the tardy disclosure. Nor did Clarke request a continuance to develop this defense or ask that a mistrial be declared. The specific showing of concrete prejudice that *Brady* requires thus has not been made.

Finally, the extensive evidence of Clarke's guilt confirms that the ill-timed disclosure could not have affected the outcome. The jury heard Clarke's four separate, "exhaustive and detailed" confessions, *Clarke*, 767 F. Supp. 2d at 54, as well as corroborating testimony from Joseph and Percival. Most relevantly, the jury heard that, on the day after leading officers to the false campsite, Clarke led them to the site where Maharaj was held and ultimately buried. Accordingly, the defendants have not met their burden of demonstrating a reasonable probability that either the misleading testimony or its belated disclosure made a difference in the outcome of their cases.

**B.**

At trial, prosecutors asked Percival if Kenneth Pierre (Wayne Pierre's brother, an uncharged, non-testifying, alleged co-conspirator) had said anything about Maharaj's condition during the kidnapping. According to Percival's reply, Kenneth Pierre had said that Demerieux "hit the man in his head with a big stone and dent his head." J.A. 3436. But when Trinidadian police x-rayed Maharaj's skull to investigate this claim, they found no such damage to his skull. Defendants did not learn of this x-ray evidence until the government turned over Agent Clauss's grand jury testimony referring to the x-ray weeks after Percival testified.

Demerieux's counsel moved for a mistrial, arguing that she would have obtained testimony from the person who conducted the x-ray if she had known earlier that it existed. But the prosecution noted that Dr. Des Vignes, the Trinidadian forensic pathologist who conducted Maharaj's autopsy, had reported that he "did not see any fracture on [Maharaj's] head," and that all parties had that report long in advance of Percival's testimony. J.A. 4610–11, Gov't Br. 136. The district court denied the motion for a mistrial, finding that "the evidence was disclosed in time for [Demerieux's] counsel to make effective use of it." *Clarke*, 767 F. Supp. 2d at 41.

This *Brady* claim fails because there is no reasonable probability that earlier disclosure would have affected the jury's verdict. First, the substance of the x-ray evidence—the absence of any fractures in Maharaj's skull—had already been disclosed to the defense through Dr. Des Vignes's report, which had been released to defense counsel well before Percival's testimony. Thus the delayed release of the x-ray itself did not deprive the defense of its powerful ammunition for cross-examination.

Second, Demerieux's counsel made extensive use of the late-developing x-ray evidence to undermine Percival's credibility, including by dramatically confronting the Trinidadian forensic pathologist with the x-ray of Maharaj's skull showing no fracture. Demerieux's closing argument underscored that the x-ray was "proof positive [that] what Jason Percival claims happened didn't happen." J.A. 5131. Demerieux fails to demonstrate how earlier release of the x-ray evidence would have made it any clearer to the jury that, whatever else Mr. Maharaj may have suffered, there was no support for Percival's testimony that Demerieux hit Mr. Maharaj over the head with a rock.

Third, earlier access to the x-ray evidence could not have overcome the abundant evidence of Demerieux's guilt, including his two confessions, and Joseph's testimony that Demerieux guarded Maharaj and took part in his dismemberment. The reality is that the alleged assault with the rock formed a small part of a very large trial. Evidence of Demeriux's involvement in a brutal kidnapping and in dismembering Mr. Maharaj's body made the issue of whether Mr. Maharaj was also hit with a rock of little relevance. There thus is no reasonable possibility that the delayed disclosure affected the jury's judgment, or that earlier disclosure would have made any difference on the jury's consideration of the case.

Finally, Demerieux's *Napue* claim also fails. For many of the same reasons, he has not shown any reasonable probability that the misleading testimony influenced the jury's verdict.

## C.

In his initial confession after his arrest in 2006, Russell Joseph claimed that Ricardo Stevenson (who was not charged in this case) drove the "clear car" after Maharaj's abduction.[12] But at trial, Joseph testified that defendant De Four drove the clear car. The defense learned of the earlier confession a mere two hours before Joseph took the stand.

De Four promptly raised a *Brady* objection. His counsel acknowledged, however, that the disclosure came in time for him "to use" the initial confession in cross-examination. In

---

[12] The "clear car" was tasked with clearing the roads ahead of the get-away car, watching for police, and relaying information back. Gov't Br. 8.

addition, the court granted a mid-trial continuance that afforded De Four's counsel an "opportunity to conduct an additional investigation in Trinidad," including five days to depose witnesses there.   J.A. 4018.

The district court subsequently denied De Four's *Brady* motion, reasoning that the disclosure came early in a two-month long trial and that the lengthy continuance mid-trial had allowed the defendants to conduct further investigation. For that reason, the "disclosure occurred in time for defense counsel to use it effectively."   *Clarke*, 767 F. Supp. 2d at 44. The court also held that any error was harmless, because the evidence of De Four's guilt was "overwhelming."   *Id.* at 46–47.

The district court properly denied the *Brady* claim because the belated disclosure was not prejudicial.   The record shows that De Four made powerful use of Joseph's contradictory statements.   De Four forced Joseph to admit on the stand and in front of the jury that he had lied to police when he accused an innocent man in a capital crime, and that he had done so to protect himself.   And De Four's counsel skewered the inconsistency in Joseph's explanation for his lies, which was that Trinidadian police told him to leave the "soldiers" out of his account.   As it turns out, both Stevenson and De Four were soldiers in the Trinidadian military, so there was no reason to finger Stevenson rather than De Four in the initial confession.

But devastating cross-examination alone does not answer De Four's claim of prejudice.   He argues that the belated disclosure impaired his entire defense strategy.   More specifically, De Four argues that the pre-trial disclosure that *Brady* required would have allowed him to argue that Joseph was right the first time and that Stevenson was the real clear car driver.   In so doing, De Four continues, his defense could have

undermined other critical testimony from Percival linking him to the crime by demonstrating a pattern of kidnappings in which Stevenson was the clear car driver.

De Four, however, does not argue that earlier disclosure would have prompted a different strategy at trial. Instead, he claims that he would have made the same arguments that ultimately "foundered at trial for lack of proof," Def. Br. 108, but that he would have provided more evidence to back them up. This is not a case, in other words, in which the defense would have had to turn on a dime to change its trial strategy in light of late-disclosed evidence. Instead, the initial Joseph confession fit hand-in-glove with the third-party defense strategy De Four's counsel had planned all along.

De Four claims that earlier disclosure would have alerted him to the importance of the Gopaul kidnapping, a previous crime in which Stevenson drove the clear car. Armed with that evidence, De Four argues that he would have had a better shot at convincing the jury that Percival had orchestrated a web of lies designed to frame him.

The district court had already ruled that the government could not introduce evidence about the Gopaul kidnapping, given its potential to prejudice the jury. The record shows that De Four had ample time to reevaluate the importance of the Gopaul kidnapping and, if he desired, seek the court's permission to incorporate it into his third-party defense. Early in June, just after the start of the trial, De Four had a transcript of Percival's testimony identifying Stevenson as the clear car driver in the Gopaul kidnapping. In July, his counsel interviewed Stevenson in Trinidad during a week-long break in the trial. If De Four needed still more time to investigate after the disclosure of Joseph's confession, he could have sought a

further continuance from the district court for that purpose. But he did not.

On top of that, overwhelming evidence supported the jury's decision to convict. De Four confessed at length to his participation in the crime. His cell phone records corroborated that confession. And other witnesses confirmed De Four's role in the crime, including one witness who testified that De Four actively participated in planning the abduction and later reported back on its success. Nothing in Joseph's first confession or in the Gopaul case lends credibility to De Four's argument that the police tricked him into confessing.

De Four himself admits, in fact, that the jury was not "required to acquit him if they believed that he did not drive the clear car," and argues only that "the Government's case against him would surely have been weaker." Def. Br. 108. Maybe so, but not so much weaker that it would have made a difference. The evidentiary weight against De Four eliminates any reasonable probability that more or earlier investigation would have changed the outcome.[13]

Finally, all six defendants ask us to consider the cumulative impact of the *Brady* and *Napue* violations on the trial. That approach might work in a case where multiple errors affect the same defendant. If the prosecution fails to turn over two pieces of impeachment evidence, for example, an error-by-error approach might find no *Brady* violation in either case because for each scenario the evidence as a whole—including the evidence left unimpeached because of

---

[13] The district court also denied Sealey's *Brady* motion arising from this same tardy disclosure. Because Sealey's arguments on appeal make no showing of prejudice, his claim fails as well.

the other alleged violation—would be enough to sustain the conviction. But the synergistic force of the omitted evidence considered together might well generate a reasonable probability of altering the evidentiary balance. Taking all the errors together thus keeps the *Brady* inquiry from devolving into a game of evidentiary whack-a-mole. *See Kyles v. Whitley*, 514 U.S. 419, 420 (1995) ("[T]he state's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence considered item by item.").

But a cumulative approach does not help the defendants here. Each alleged violation only affected one of the defendants, and no two errors affected the same defendants. There simply was no defendant-specific cumulative impact that could alter the prejudicial effect of the prosecution's substantial missteps.

## VI.

### *Miranda* Claims

Sealey and Demerieux challenge the denial of their motions to suppress custodial statements that they gave to the Trinidadian police and to the FBI on the ground that their statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Because the Trinidadian and FBI interrogations were independent and distinct, and because Sealey and Demerieux do not challenge the legal sufficiency of the *Miranda* warnings that the FBI gave before questioning, we hold that no violation of *Miranda* occurred.[14]

---

[14] De Four and Straker purport to join Demerieux's and Sealey's *Miranda* claims. Def. Br. 115 n.50. But "Fifth Amendment rights

57

**A.**

**1.**

The FBI began its investigation into the Maharaj hostage taking in April 2005, led by Special Agent Clauss. A separate investigation by Trinidadian police was already underway, led by Constable Phillip Forbes. Between April 2005 and January 2006, FBI Agent Clauss flew to Trinidad five times. He traveled there twice in April or May 2005, to begin the investigation. He returned in October, at which time the Trinidadian police brought a new witness to the U.S. Embassy for an interview with FBI agents. Constable Forbes remained present during the interview, but did not ask any questions.

The following month, Agent Clauss returned to meet the new Trinidadian homicide detective assigned to the case, Sergeant Lucas. Agent Clauss informed Sergeant Lucas that the FBI had an ongoing investigation, but did not attempt to direct the investigation of the Trinidadian police. Agent Clauss explained that the Trinidadian police "were conducting their own investigation regarding what they believed was a homicide," while he and his partner, FBI Agent Edgar Cruz, were investigating the hostage taking. J.A. 2479. "They were parallel investigations that were clearly similar in nature," Agent Clauss testified, "but I didn't feel a need to tell them what they should or shouldn't do, nor would I be in a place to do that[.]" *Id.*

Agents Clauss and Cruz returned to Trinidad on January 3, 2006, and met with Sergeant Lucas and his team of

are, *a fortiori*, personal rights" in which De Four and Straker cannot share. *Bryson v. United States*, 419 F.2d 695, 699 (D.C. Cir. 1969).

investigators. Sergeant Lucas told Agent Cruz that the Trinidadian police planned to make their first arrests the following morning. True to their word, the Trinidadian police arrested Clarke and Demerieux the next day. The FBI was not invited to participate in the arrests. But Agents Clauss and Cruz did question Demerieux later that day with "members of the Trinidad[ian] police force[.]" *United States v. Clarke*, 611 F. Supp. 2d 12, 40 (D.D.C. 2009).

Demerieux was again interviewed by the Trinidadian police and FBI agents on January 5th, "albeit briefly." *Clarke*, 611 F. Supp. 2d at 40. The district court found that, during both interviews, Demerieux (i) was "notified of his rights" under both U.S. and Trinidadian law, (ii) "agreed to waive his rights," (iii) "did not request a lawyer," and (iv) "was not mistreated, threatened or coerced by law enforcement[.]" *Id.* at 41. Concluding that they had insufficient evidence to hold Demerieux, the Trinidadian police released him. *Id.*

After his arrest, Clarke, who was in Trinidadian custody, agreed to show the Trinidadian police a forest camp where he claimed Maharaj had been held. Agents Clauss and Cruz were invited to accompany a "large group of Trinidad[ian] police officers" to the site. *Clarke*, 611 F. Supp. 2d at 26. The next day, Clarke identified the location "where the two containers holding the victim's remains were buried." *Clarke*, 767 F. Supp. 2d at 21. The FBI later assisted with the recovery and identification of those remains. *Id.*

The Trinidadian police also arrested Straker on January 6th. *Straker*, 596 F. Supp. 2d at 84. A few days later, Sergeant Lucas informed Agent Clauss of the arrest. *Id.* at 85. Sergeant Lucas then allowed Agent Clauss to interview Straker, remaining present during that interview. *Id.*

On March 31, 2006, the Trinidadian police rearrested Demerieux, and Sergeant Lucas informed Agent Clauss of the arrest later that same day. *Clarke*, 611 F. Supp. 2d at 41. The district court found that, when Agent Clauss and Sergeant Lucas spoke on the phone, they "did not discuss the substance of the investigation and Clauss did not attempt to direct the investigative efforts of the Trinidad[ian] police in any way." *Id.*

**2.**

When the Trinidadian police rearrested Demerieux, they "informed him of his rights under Trinidad[ian] law," which include, among others, the right to remain silent, the right to speak with a legal representative, relative, or friend, and a warning that statements may be used against the accused in court. *Clarke*, 611 F. Supp. 2d at 22, 41. Demerieux neither invoked his rights nor requested to contact a lawyer. Once at the police station, Demerieux "indicated that he wanted to give a statement." *Id.* at 42. The Trinidadian police reiterated the warnings required under Trinidadian law, and specifically advised Demerieux "that he had the right to contact a lawyer, relative or friend." *Id.* Demerieux reaffirmed his desire to give a statement. The Trinidadian police then contacted a Justice of the Peace, who met privately with Demerieux, questioning him about how the police had treated him and whether he had voluntarily agreed to give a statement. *Id.* Demerieux said that he had been treated well and confirmed his desire to give a statement. The Justice of the Peace explained to Demerieux that he had the right to contact an attorney and informed him that he did not have to give a statement. *Id.* Once that meeting concluded, "Demerieux was ready to give a formal statement." *Id.*

A Trinidadian officer transcribed Demerieux's statement by hand, including "a certification that expressed Demerieux's understanding of his rights, his waiver of his rights and his desire to give a statement." *Clarke*, 611 F. Supp. 2d at 42. That certification was read aloud to Demerieux, who indicated his understanding and signed his name. After finishing his statement, Demerieux was given the opportunity to review it, and the Trinidadian police also read it aloud to him. *Id.* After Demerieux made several changes, he "signed the statement and acknowledged that it was true and had been made of his own free will." *Id.*

Agents Clauss and Cruz arrived back in Trinidad the next day. *Clarke*, 611 F. Supp. 2d at 43. The Trinidadian police "granted the FBI access to Demerieux," who "agreed to conduct an interview with them." *Id.* Agent Clauss, though aware that Demerieux had given a statement the day before, testified that he had neither seen it nor discussed its substance with anyone from the Trinidadian police. *Id.*

Agents Clauss and Cruz then began their own interview with Demerieux. They presented him with an international advice of rights form, which they read to him "verbatim[.]" *Clarke*, 611 F. Supp. 2d at 43. The form generally advised Demerieux of his *Miranda* rights, but informed him that appointment of counsel could not be assured while he remained in foreign custody.[15] Agent Clauss also "explained Demerieux's rights to him in a more informal way." *Id.*

---

[15] The form stated in full:

We are representatives of the U.S. government. According to our laws, you are entitled to certain rights. Before we ask you

any questions, we want to be certain that you understand such rights.

You do not have to speak to us nor do you have to answer any questions. Even though you may have spoke[n] to the Trinidad[ian] authorities, you do not have to speak to us right now. If you do speak to us, everything that you say can be used against you in a court of law, in the United States or anywhere else.

In the United States, you would have the right to seek advice from an attorney before we asked you any questions and to have an attorney with you during your interrogation. If you were in the United States and could not afford an attorney, you would be provided an attorney at no cost before submitting to any questions, if you so desired. Since you are not in our custody, nor are we in the United States, we cannot assure that you will have access to an attorney, nor can we assure that you will be provided with an attorney before we ask you any questions, or when we are asking such questions. If you wish to have an attorney but Trinidad[ian] authorities do not allow you access to one, or if they refuse to provide you an attorney at this time, you may opt not to speak to us. If you decide to speak to us without an attorney present, you reserve the right to decline to answer our questions at any time.

Moreover, you should understand that if you choose not to speak to us, that fact may not be used as evidence against you in a court of law in the United States.

It ends with the following statement and waiver of rights:

I have read this notice of my rights and I understand what my rights are.

I am prepared to give a statement and to answer questions.

"After the verbal warnings, Demerieux then initialed and signed the form, waiving his rights and agreeing to speak to the agents." *Clarke*, 611 F. Supp. 2d at 43. Demerieux never requested an attorney. *Id.* The two FBI agents conducted the three-hour interview alone, without anyone from the Trinidadian police participating. *Id.* The district court found that "the FBI treated Demerieux fairly and there is no evidence of any coercive tactics." *Id.*

**3.**

The Trinidadian police arrested Sealey on August 8, 2006. *Straker*, 596 F. Supp. 2d at 102. Later that day, Sealey told a Trinidadian police officer that he wanted to talk about the kidnapping. In response, the officer "identified herself as a Trinidad[ian] police officer, and cautioned him as to his rights under Trinidad[ian] law[.]" *Id.* After Sealey reiterated his desire to talk, the Trinidadian officer "requested the presence of a Justice of the Peace." *Id.* The Justice of the Peace spoke "privately with Sealey." *Id.* at 102. After that meeting, the Justice of the Peace advised the officer that Sealey wanted to speak with his father. *Id.* Sealey, his father, and the Justice of the Peace then had a private meeting, at which, according to the Justice of the Peace's handwritten certification, Sealey

---

I do not wish to have an attorney at this time.

I understand and know what I am doing.

I have received no promises or threats nor have I been subjected to pressure or coercion of any sort.

Dkt. 258-5 (Aug. 11, 2008).

confirmed that he was making his statement "knowingly and voluntarily."  *Id.*

Meanwhile, having been notified of Sealey's arrest, FBI Agent Marvin Freeman arrived at the police station.  *Straker*, 596 F. Supp. 2d at 102.  The Trinidadian officers did not "include Freeman in their preparations, having had no discussions with him about the investigation before that day." *Id.* at 103.  During Sealey's interview by Trinidadian officers, Agent Freeman sat in an adjacent cubicle "over 10 feet away and could hear the interview taking place."  *Id.*  The Trinidadian police officers did not consult with Agent Freeman during the interview, and "Freeman did not make any suggestions to the officers about any areas of inquiry."  *Id.*

One Trinidadian police officer read Sealey his rights under Trinidadian law, and asked him to sign the following statement:  "'I, Michael Bourne, also known as Christopher Sealey and Boyie, wish to make a statement.  I want someone to write down what I say.  I have been told that I need not say anything unless I wish to do so and that whatever I say may be given in evidence.  I have also been told that I have the right to retain a legal adviser.'"  *Straker*, 596 F. Supp. 2d at 103. Sealey signed the statement, and Sealey's father and the Justice of the Peace signed as witnesses.  *Id.*

Sealey confessed to his role in the kidnapping, and a Trinidadian police officer handwrote a transcript.  *Straker*, 596 F. Supp. 2d at 103.  She then read the transcript to Sealey, who made corrections, each of which he signed.  *Id.*  Sealey also handwrote the following statement:  "The above statement has been read to me, and I have been told that I can correct or add anything I wish.  This statement is true.  I have made it of my own free will."  *Id.*  Sealey's father and the Justice of the Peace signed as witnesses, and the Justice of the

Peace wrote an additional certification about the interview, "summarizing his initial private meeting with Sealey and his father and Sealey's waiver of rights, and then confirming that Sealey had been read the full statement in the presence of his father before making the handwritten certification that it was correct." *Id.* at 104.

After they finished questioning Sealey, the Trinidadian police allowed Agent Freeman to interview him. *Straker*, 596 F. Supp. 2d at 104. Agent Freeman read Sealey his rights based on an "'international advice of rights' form." *Id.*; *see supra* note 15. Sealey signed the form, and his father, who remained present throughout, signed as a witness, along with another Trinidadian police officer. *Id.* at 105. The district court found that "Sealey did not ask to stop the interview, nor did he appear to be in distress or discomfort." *Straker*, 596 F. Supp. 2d. at 105.

## B.

Before trial, Demerieux moved to suppress his March 31st statement to the Trinidadian police, and his April 1st statement to the FBI. *Clarke*, 611 F. Supp. 2d at 40. Sealey likewise moved to suppress the statements he made on August 8, 2006, both to the Trinidadian police and to the FBI. *Straker*, 596 F. Supp. 2d at 105.

As relevant here, both argued that the statements were inadmissible because the Trinidadian police and the FBI were engaged in a "joint venture," and accordingly *Miranda* warnings were required before the interviews by the Trinidadian police. *Id.*; *Clarke*, 611 F. Supp. 2d at 40. They also contended that the statements should be suppressed because they were involuntary. *See Straker*, 596 F. Supp. 2d at 105; *Clarke*, 611 F. Supp. 2d at 40.

The district court rejected both motions.  *See Straker*, 596 F. Supp. 2d at 108–09; *Clarke*, 611 F. Supp. 2d at 44–45. Relying on the government's concession, the court assumed that *Miranda* applies to FBI questioning of non-resident aliens held in foreign custody abroad.  *Clarke*, 611 F. Supp. 2d at 29 & n.12 (quoting Gov't Opp'n to Clarke Mot. at 20 (Dkt. No. 353)); *see also id.* at 43–44.  The court noted, however, that *Miranda* did not govern the interrogations by the Trinidadian police unless those interrogations were "the product of a joint venture," which exists when "'United States law enforcement agents actively participate in the questioning of the defendant or the foreign officials act as agents or virtual agents of the United States.'"  *Id.* at 43–44 (quoting *Straker*, 596 F. Supp. 2d at 106).

With respect to Demerieux's March 31st statement to the Trinidadian police, the court found no "active participation" by the FBI, as Agents "Clauss and Cruz did not even arrive in Trinidad until the following day[.]"  *Clarke*, 611 F. Supp. 2d at 44.  The district court further determined that the "two law enforcement entities were conducting independent investigations, they were not sharing information, and the FBI was in no way directing the activities of the Trinidad[ian] police."  *Id.*  Finding "no evidence that the Trinidad[ian] police were acting as agents, or virtual agents, of the FBI at the time he made his statement on March 31," the district court concluded that there was no joint venture.  *Id.*  The court further found that "Demerieux was well aware of his rights, voluntarily agreed to waive those rights, and gave a statement to the Trinidad[ian] police of his own free will."  *Id.*  The court reached the same conclusion about the voluntariness of Demerieux's April 1st statement to the FBI.  *Id.* at 44–45.

With respect to Sealey's August 8th statements, the district court found "simply no evidence" that the separate interviews of Sealey by the Trinidadian police and the FBI amounted to a joint venture. *Straker*, 596 F. Supp. 2d at 106. The district court found that the testimony "overwhelmingly established that there were two distinct interviews[.]" *Id.* The court also determined that "the Trinidad[ian] police and Freeman were not acting jointly with respect to the investigation of Sealey at the time the interview took place," finding that the FBI (i) "did not participate in Sealey's arrest on August 8, 2006"; (ii) "was [not] even remotely involved in setting up Sealey's interview with the Trinidad[ian] police"; and (iii) "was not allowed to participate in the Trinidad[ian] officers' interview of Sealey, observe the interview, or submit any questions," but was instead "only permitted to conduct [its] own separate interview." *Id.* at 106–07. Thus, "under even a broad view of the 'joint venture' standard," the district court concluded, "[w]hatever information-sharing or cooperation might have occurred with respect to other defendants, there is nothing to support a finding that the Trinidad[ian] police and the FBI were acting 'jointly' on August 8, 2006[.]" *Id.* at 107.

## C.

The parties dispute the standard of review applicable to the joint-venture question. Demerieux and Sealey contend that the district court's factual findings are reviewed for clear error, but that the ultimate question of whether the facts found constitute a joint venture is a legal question reviewed *de novo*. That is analogous to how we review a district court's conclusion that, under the totality of the circumstances, an accused "waived his fifth and six[th] amendment rights 'voluntarily, knowingly, and intelligently.'" *United States v. Yunis*, 859 F.2d 953, 958 (D.C. Cir. 1988) (quoting *Miranda*, 384 U.S. at 444). The government, by contrast, argues that

our review is for clear error only. We need not resolve the question in this case because, even reviewing *de novo*, we affirm.

**D.**

**1.**

We note at the outset that the government concedes that the Fifth Amendment privilege against self-incrimination protects nonresident aliens facing criminal trial in the United States, even when, as here, the questioning by federal authorities took place abroad. Gov't Br. 187–88 n.93 ("Below, the government conceded the applicability of the Fifth Amendment to the FBI's overseas actions."); Oral Arg. Tr. 135:18–19 ("[W]e appropriately concede it[.]"); *see also In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 198–201 (2d Cir. 2008) (so concluding). Relatedly, despite some equivocation below, *see Clarke*, 611 F. Supp. 2d at 29 n.12, the government has conceded on appeal the applicability of *Miranda* to interrogations by U.S. authorities of individuals in foreign police custody, *see* Oral Arg. Tr. 135; Gov't Br. 187–88 n.93. For those reasons, we assume, without deciding, that *Miranda* applies to statements obtained by U.S. authorities from suspects held in foreign custody abroad.

The Fifth Amendment's self-incrimination clause provides that no "person" "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. As the Supreme Court held in *Miranda*, that privilege against compelled self-incrimination is "applicable during a period of custodial interrogation." 384 U.S. at 460–61. That is because "the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other

official investigations," *id.* at 461, which "heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself,'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda*, 384 U.S. at 439) (alterations in original).

To protect against that risk, *Miranda* set forth "concrete constitutional guidelines for law enforcement agencies and courts to follow." 384 U.S. at 442. "Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings": that "a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Dickerson*, 530 U.S. at 435 (quoting *Miranda*, 384 U.S. at 479).

A different rule applies, however, to statements obtained abroad by foreign officials. *See* Wayne R. LaFave et al., 2 *Criminal Procedure* § 6.10(d) (3d ed. 2013) ("[T]hough a defendant may be entitled to keep out of a prosecution in this country a confession by him which was involuntarily given to a foreign policeman, he may not obtain the suppression of a confession obtained by such an official merely because the *Miranda* warnings were not given."). As a prophylactic rule, *Miranda* safeguards the constitutional privilege against compelled self-incrimination by deterring negligent or willful police misconduct that could impinge upon the Fifth Amendment right. *See Oregon v. Elstad*, 470 U.S. 298, 308 (1985) (noting a principal aim of *Miranda* is "deterrence"); *Michigan v. Tucker*, 417 U.S. 433, 447 (1974) (discussing the "deterrent purpose of the exclusionary rule"). But because the

*Miranda* exclusionary rule would "have little, if any, deterrent effect upon foreign police officers," *In re Terrorist Bombings*, 552 F.3d at 202, courts have held that "statements obtained from a defendant by foreign law enforcement officers, even without *Miranda* warnings, generally are admissible" as long as they are "voluntary," *United States v. Abu Ali*, 528 F.3d 210, 227 (4th Cir. 2008); *see also* LaFave, *supra*, § 6.10(d) n.59 (it is "commonly assumed" that the voluntariness requirement still applies to confessions obtained during overseas interrogations by foreign officers, but "it may well be that . . . the defendant can object only if the confession was obtained by methods making its reliability suspect or, perhaps, by methods which 'shock the conscience'").[16]

Under the "joint venture" doctrine, custodial statements obtained by foreign officials without *Miranda* warnings are inadmissible in United States courts if those officials were "engaged in a joint venture with, or . . . were acting as agents of, United States law enforcement officers." *Abu Ali*, 528 F.3d at 228. Demerieux and Sealey argue that the FBI and the Trinidadian police were engaged in such a coordinated, joint investigation, and accordingly the statements given to the Trinidadian police without *Miranda* warnings must be

---

[16] We have never decided what standard determines the admissibility of statements obtained abroad by foreign police officers, though it has been suggested that the ordinary voluntariness standard governs. *See Yunis*, 859 F.2d at 971 (Mikva, J., specially concurring) (arguing that voluntariness standard should apply because, "[i]n *Bram v. United States*, 168 U.S. 532 (1897), the Court excluded a confession from an American trial, notwithstanding that the coercive interrogation was conducted by a foreign police officer in a foreign country"). We need not decide that question today because Demerieux and Sealey do not dispute voluntariness distinct from their *Miranda* claims.

suppressed. Demerieux and Sealey also argue that their statements to the FBI should have been suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2004), which generally prevents police from sanitizing an unwarned statement by giving the suspect after-the-fact *Miranda* warnings and then having the suspect repeat the incriminating statement.

**2.**

The "joint venture" doctrine ensures that United States law enforcement agents cannot circumvent their obligations under *Miranda* just by outsourcing custodial interrogation to foreign agents while still "actively participat[ing] in the questioning conducted by foreign authorities," *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003), or by having "the foreign officials act as [their] agents or virtual agents," *Straker*, 596 F. Supp. 2d at 106.

Demerieux and Sealey acknowledge that the FBI did not participate at all, let alone "actively participate," *Yousef*, 327 F.3d at 145, in the Trinidadian police interrogations, Oral Arg. Tr. 119:25–120:1 ("[T]his was clearly not a joint venture in the questioning[.]"). And Demerieux and Sealey do not attack as clear error the district court's factual findings concerning the operational independence of the interrogations. *Id.* at 109:8–9. Indeed, Demerieux and Sealey concede that, if the inquiry is confined to the days of their respective interrogations, there is nothing to support a conclusion that the Trinidadian police and the FBI were acting jointly. *Id.* at 109:11–14.

Focusing instead on several preceding incidents of cooperation between the two law enforcement agencies, Demerieux and Sealey assert that the cooperation rose to the level of a "prior joint investigative venture" from which the interrogations by the Trinidadian police "sprang." Def. Br.

120.  They point in particular to: (i) Agent Clauss's meeting with the Trinidadian police in late 2005 and the resulting exchange of information between the two law enforcement agencies; (ii) the Trinidadian police's aid to the FBI in securing an interview of a cooperating witness in January 2006; (iii) the joint trips by the FBI and the Trinidadian police to investigate campsite where Maharaj was said to be held and where Maharaj was buried, and the forensic assistance provided by the FBI during the discovery and autopsy of Maharaj's remains; and (iv) the joint interview of Straker by the FBI and the Trinidadian police on January 9, 2006.

We need not decide whether the joint-venture inquiry turns on the amount of coordination across the whole eighteen-month, multi-defendant investigation or only in the discrete interrogations to which *Miranda* could apply. *Compare United States v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978) (inquiring into the totality of the involvement of U.S. law enforcement agents in the investigation and arrest of suspects), *with Yousef*, 327 F.3d 145–46 (inquiring into U.S. law enforcement officers' participation in the interrogations to which *Miranda* could have applied).  Even assuming that the nature of the full investigative relationship governs, the isolated incidents of routine cooperation between the Trinidadian police and the FBI do not amount to the type of closely coordinated investigative effort that would trigger the joint venture doctrine.

To begin with, there was no "coordination and direction" of the Trinidadian investigation by the FBI.  *See Abu Ali*, 528 F.3d at 229.  Nor is there evidence of "active" or "substantial" participation by U.S. law enforcement agents in the Trinidadian investigation.  While FBI officers were physically present during one Trinidadian interrogation, such silent observation does not make the interrogation the FBI's own for

purposes of *Miranda*. *See id.* ("[M]ere presence at an interrogation does not constitute the 'active' or 'substantial' participation necessary for a 'joint venture[.]'"); *see also Pfeifer v. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir. 1973). Nor is it enough that foreign law enforcement agents granted a U.S. law enforcement agent permission to question a suspect. *See United States v. Heller*, 625 F.2d 594, 599–600 & n.7 (5th Cir. 1980) (no joint venture where U.S. officers had to get permission from British authorities to interview the suspect, *Mirandized* the suspect when questioning him, and did not discuss with British authorities the separate un-*Mirandized* interrogation those authorities had conducted).

Likewise, the forensic assistance provided by the FBI during the recovery, autopsy, and identification of Maharaj's remains does not trigger *Miranda* both because the assistance was limited in time and scope, and because it served the FBI's own independent investigative efforts. *See United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir. 1983) ("[C]lose cooperation between American and Canadian officials [was] insufficient to upset [the trial court's] finding that [the Canadian official] conducted the search on his own country's authority and in connection with an ongoing Canadian investigation."); *see also Heller*, 625 F.2d at 599–600 (no joint venture when, *inter alia*, participation by U.S. law enforcement officers in suspect's arrest "was peripheral at most"); *United States v. Mundt*, 508 F.2d 904, 906–07 (10th Cir. 1974) (*Miranda* inapplicable where U.S. law enforcement officer "merely . . . played a substantial part in the events which led up to the arrest of [defendant], but once the arrest was made the Peruvian Police took over").

Instead, the types of joint ventures that have triggered *Miranda* have involved levels of coordination and interaction

far more extensive than what occurred here. There is no evidence in this case, for example, that the Trinidadian police were "acting on behalf of" the FBI "in an effort to extradite" Demerieux and Sealey to the United States. *Cranford v. Rodriguez*, 512 F.2d 860, 863 (10th Cir. 1975).

Nor is this case like *Emery*, 591 F.2d at 1268, on which Demerieux and Sealey heavily rely. There, agents of the U.S. Drug Enforcement Agency contacted Mexican officials about suspected drug activity, coordinated surveillance, supplied an undercover agent as the pilot for a drug transport plane in a Mexican sting operation, signaled when to arrest the suspects after determining that drugs were located in suitcases, and were present at the suspects' interrogation. *See id.* Such extensive coordination, active participation, and direction by U.S. law enforcement officers far surpasses the limited cooperation between the Trinidadian police and the FBI here.[17]

Indeed, if the isolated and infrequent interactions and courtesies that occurred here sufficed, all manner of routine international cooperation would be subject to *Miranda*'s strictures regardless of whether U.S. law enforcement officers have any practical authority over or responsibility for the interrogations and investigative measures undertaken by foreign officials. *Miranda* is a prophylaxis designed to regulate and deter the coercive conduct of domestic law enforcement officers. *See In re Terrorist Bombings*, 552 F.3d at 202. It is not meant to police independent foreign investigative activities that U.S. law enforcement officers do not direct and cannot control.

---

[17] We have found no case, and defendants have cited none, in which the type of occasional interactions at issue here amounted to a joint venture.

**3.**

Because there was no joint venture, *Seibert* does not require suppression either. In *Seibert*, the Supreme Court evaluated a police protocol under which the interrogating officer deliberately withheld *Miranda* warnings until the suspect confessed, and then gave the full *Miranda* warnings *post hoc* before having the suspect repeat the confession. *Seibert*, 542 U.S. at 605–07 (plurality).

When confronted with such question-first-and-warn-later tactics, courts must determine "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611–12. The *Seibert* plurality focused on such factors as "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. Concurring in the judgment, Justice Kennedy stated that he "would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring in the judgment).

In light of the fractured decision in *Seibert*, courts have debated whether the plurality opinion's multifactor test controls, or whether Justice Kennedy's concurrence is the narrower rationale that is binding under *Marks v. United States*, 430 U.S. 188, 193 (1977). *Compare United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) ("[W]e find *Seibert*'s holding in Justice Kennedy's opinion concurring in

the judgment."), *with United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009) ("[T]he *Marks* rule is not applicable to *Seibert*," as "Justice Kennedy's intent-based test was rejected by both the plurality opinion and the dissent[.]").

We need not pick sides in that debate because (i) *Seibert* does not apply on these facts and, even if it did, (ii) Demerieux's and Sealey's statements were admissible under both the plurality's and Justice Kennedy's tests.

First, *Seibert* applies only when the accused is questioned first, then warned later. *See* 542 U.S. at 611–12. That did not happen here. The district court found—and Demerieux and Sealey do not dispute—that the Trinidadian police's warnings under Trinidadian law were "functionally equivalent" to those required by *Miranda*. *Straker*, 596 F. Supp. 2d at 107 n.24; *Clarke*, 611 F. Supp. 2d at 44 n.27; *see also* Oral Arg. Tr. 111:9–18. Simply put, there was no two-step interrogation because (i) the Trinidadian police and the FBI were not acting in concert and, in any event, (ii) both gave warnings the adequacy of which under *Miranda* Demerieux and Sealey do not challenge.

Second, Justice Kennedy's test applies only when police deliberately use a two-step interrogation to thwart *Miranda*. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Such deliberate evasion is absent in this case. Demerieux and Sealey concede both that "there was no evidence of a protocol that directed the FBI to swoop in after [the Trinidadian police] secured a confession," Reply Br. 59, and that the Trinidadian police and the FBI were not acting jointly on the days of their interrogations, *see* Oral Arg. Tr. 119:25–120:6. There accordingly was no "interrogation technique designed to . . . undermine[] the *Miranda* warning

and obscure[] its meaning." *Seibert*, 542 U.S. at 618 (Kennedy, J., concurring in the judgment).

Third, even under the *Seibert* plurality's multifactor test, Demerieux's and Sealey's claim would fail. Although both the Trinidadian police and the FBI thoroughly questioned Demerieux and Sealey, and thus elicited confessions the content of which largely overlaps, those two factors do not outbalance the other considerations demonstrating the efficacy of the intervening FBI *Miranda* warnings. To start, given the timing and setting of the first statement to the Trinidadian police and the second statement to the FBI, "a reasonable person" "could have seen" the FBI's questioning "as a new and distinct experience" during which he retained "a genuine choice whether to follow up on the earlier admission" to the Trinidadian police. *Seibert*, 542 U.S. at 615–16. The Trinidadian police began their interviews by apprising Demerieux and Sealey of their rights under Trinidadian law, while the FBI informed them of their rights under U.S. law. Those separate rounds of separate warnings not only made Demerieux and Sealey aware that each round of questioning was distinct, but also reminded them on each occasion that they had the right to remain silent. The distinctness of the interrogations is particularly stark for Demerieux, whose interrogation by the FBI came a day after his interrogation by the Trinidadian police. *See Clarke*, 611 F. Supp. 2d at 42.

Furthermore, unlike in *Seibert*, there was a sharp discontinuity of police personnel, and the FBI did not "treat[] the second [interrogation] as continuous with the first." *Seibert*, 542 U.S. at 615. Not only were the FBI agents who interrogated Demerieux and Sealey different from the Trinidadian police officers who initially questioned them, but the FBI agents represented an entirely different law enforcement authority from an entirely different country.

Equally importantly, the FBI agents did not refer back to the prior Trinidadian interrogations in an effort to elicit the same confessions. In *Seibert*, by contrast, the "same officer" who conducted the first, unwarned interrogation returned "only 15 to 20 minutes" later and led the suspect "over the same ground again." 542 U.S. at 613, 616. Indeed, that officer "set the scene" for the second round of questioning "by saying 'we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?'" *Id.* at 616. And when the suspect equivocated or departed from her prior statement, the officer referred "back to the confession already given," reinforcing the impression "that the further questioning was a mere continuation" of the earlier interrogation. *Id.* Here, a reasonable person would have viewed the Trinidadian police's and the FBI's interrogations as two "independent interrogations." *Id.* at 614.

## VII.

### *Edwards* **Claim**

Defendant Straker separately challenges the denial of his motion to suppress the statement he gave to the FBI on July 29, 2007, on the ground that it was obtained after he had invoked the right to counsel, in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981). Because Straker voluntarily reinitiated communication with the FBI, we reject his claim.[18]

---

[18] De Four and Sealey purport to join Straker's argument. Def. Br. 133 n.58. However, they cannot vicariously invoke Straker's personal Fifth and Sixth Amendment protections under *Edwards*. *See supra* note 14, *supra*; *see also United States v. Sabatino*, 943 F.2d 94, 96 n.1 (1st Cir. 1991) ("Sixth Amendment rights . . . are

**A.**

**1.**

The Trinidadian police arrested Straker on January 6, 2006, interrogating him once that day and again the next. *Straker*, 596 F. Supp. 2d at 84–85. On both occasions the Trinidadian police informed Straker of his rights under Trinidadian law before questioning him, including the "right to remain silent, the right to communicate with a legal representative, relative, or friend, and a caution that the statement may be used against the accused." *Id.* at 85. Straker denied any knowledge of the kidnapping or killing. *Id.* A day later, on January 8th, Straker met with his attorney, who told "Straker not to sign any documents or speak to anyone." *Id.*

On January 9th, Sergeant Lucas allowed the FBI to interview Straker. *Straker*, 596 F. Supp. 2d at 85. During the interview, Sergeant Lucas and three FBI agents—Clauss, Cruz, and Freeman—sat at the table across from Straker. *Id.* Agent Clauss read the standard FBI international advice-of-rights form to Straker, advising him of his *Miranda* rights with the standard caveat that appointment of counsel cannot be assured while he remains in foreign custody. *Id.* at 86. Discussions were "calm [and] relaxed." J.A. 2187. Straker's conversational tone left both Sergeant Lucas and Agent Cruz with the "distinct impression that [Straker] wanted to cooperate," J.A. 2291 (Agent Cruz), and was "trying to make a deal or something," J.A. 2161 (Sgt. Lucas).

---

personal in nature and cannot vicariously be asserted[.]") (citing *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)).

About halfway through the interview, Straker told the agents that he had an attorney. *Straker*, 596 F. Supp. 2d at 86. Straker said that he did not wish to talk about the details of the case "at this time," but would "rather talk to my attorney before I talk any further." J.A. 2257. The session continued "for another hour or so," with "intermittent questions from the FBI about Straker's biographical and family information" and Straker otherwise "'leading most of the conversation.'" *Straker*, 596 F. Supp. 2d at 86. Near the end of the session, Straker said that "'after having access to his attorney, he would be willing to speak to the agents.'" *Id.* at 87. Agent Clauss then advised Straker that, "after he talked to his attorney, if he wanted to make an attempt to contact" them, they "would be willing to follow up with him at that point." J.A. 2191. To that end, Agent Freeman gave Straker his card, which contained his contact information at the U.S. Embassy in Trinidad. *Straker*, 596 F. Supp. 2d at 87. The FBI then ended the interview. *Id.*

"[A]bout two weeks" later, having met with his lawyer in the interim, Straker attempted to contact Agent Freeman by telephone. *Straker*, 596 F. Supp. 2d at 88–89, 94. There is no recording of Straker's message, but Agent Freeman testified that "it was to the effect of 'this is Anderson Straker; can you contact me?'" *Id.* at 89. Agent Freeman never returned Straker's call, however, because he was advised "not to do so" by a Trinidadian official in light of Straker's "legal representation" in Trinidadian courts. *Id.* at 89.

Straker was formally charged by the Trinidadian authorities on January 10, 2006, and he remained "in custody in Trinidad" for the next eighteen months. *Straker*, 596 F. Supp. 2d at 87–89. The FBI did not attempt to contact him at any point during those intervening months. *Id.* at 89.

**2.**

Straker was formally indicted in the United States on September 20, 2006. *Straker*, 596 F. Supp. 2d at 89. But he remained in Trinidadian custody until his extradition to the United States on July 29, 2007. *Id.* After formally arresting Straker at the airport in Trinidad, Agent Clauss orally advised Straker of his *Miranda* rights and gave him an FBI advice of rights form, which included the full *Miranda* warnings. *Id.* at 89 & n.13. Straker signed the form's waiver of rights, indicating that "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." *Id.* at 89. Both Clauss and Cruz signed as witnesses, and, according to their testimony, "Straker appeared willing to sign and . . . did not raise any questions about his rights." *Id.*

The FBI interviewed Straker upon arrival in Puerto Rico. *Straker*, 596 F. Supp. 2d at 90. Straker did not ask to stop the questioning "and overall seemed 'cooperative.'" *Id.* According to FBI notes, Straker "acknowledged having a role in planning the kidnapping of Balram Maharaj and described the roles of several co-defendants." *Id.*

**B.**

Straker moved to suppress his July 29, 2007 statement to the FBI. He argued that, because he had invoked his right to counsel when the FBI interviewed him in Trinidad in January 2006, the FBI was barred from subjecting him to further custodial interrogation eighteen months later when he was extradited to the United States. *See Straker*, 596 F. Supp. 2d at 84. Straker grounded his argument on *Edwards v. Arizona*, which held that, once a suspect invokes his right to counsel, police generally may not obtain a waiver of that right just by

later reopening the interrogation. 451 U.S. at 484–85. Instead, the suspect must himself reinitiate any discussion. *Id.* Straker argued that he had done nothing to invite a resumption of questioning, thus rendering his waiver of *Miranda* rights invalid.

The district court denied Straker's motion. *Straker*, 596 F. Supp. 2d at 99–100. The court again relied on the government's concession that "the Fifth Amendment privilege against self-incrimination protects nonresident aliens facing a criminal trial in the United States even where the questioning by United States authorities takes place abroad." *Id.* at 90–91. The district court then noted that *Edwards* establishes a "bright-line" rule "barring police interrogation of a subject who has invoked his right to counsel unless the subject initiates further communications with the police." *Id.* at 91 (citing *Arizona v. Roberson*, 486 U.S. 675, 681–82 (1988); *Minnick v. Mississippi*, 498 U.S. 146, 151–52 (1990)). Describing it as a "close call," the district court concluded that the message Straker left for Agent Freeman a few weeks after the January 9, 2006 interview "initiated" further communication with the FBI under *Oregon v. Bradshaw*, 462 U.S. 1039 (1983) (plurality), and that Straker had voluntarily, knowingly, and intelligently waived his right to counsel. *Straker*, 596 F. Supp. 2d at 93–95.

In so concluding, the district court credited the testimony of Agent Freeman, finding that Straker left "at least one voice mail message about two weeks after the January 9 interview, asking Freeman to call him." *Straker*, 596 F. Supp. 2d at 94. The court also considered "the context in which the message was left" to be "important," stressing that Straker had said in the first interview that "he wanted to leave the door open for further discussions" after he consulted his lawyer. *Id.* Straker then, of his own initiative, used the business card that

the FBI agent had left him "for th[e] purpose" of reopening communication to call and ask Agent Freeman to speak with him. *Id.* In the district court's view, that sequence of events could "reasonably be construed to indicate that [Straker's] initiation of communication [was] directed toward the investigation." *Id.*

The district court also concluded that, upon his extradition, Straker voluntarily, knowingly, and intelligently waived his Fifth Amendment right to counsel before giving his July 29, 2007 statement, finding that (i) Straker had "familiarity generally with the *Miranda* warnings from his January 2006 interview"; (ii) Straker was properly advised of his *Miranda* rights by Agent Clauss on July 29, 2007 and agreed to waive those rights by signing the waiver on the FBI's advice of rights form; (iii) the only "coercive circumstance" on July 29th was the handcuffs Straker wore; and (iv) the FBI had no contact with Straker in the eighteen months between the January 2006 interview and the July 2007 interview, leaving no opportunity for the FBI to "badger" Straker into signing the waiver. 596 F. Supp. 2d at 95–96. Finally, the court held that this waiver applied as well to Straker's Sixth Amendment right to counsel post-indictment. *Id.* at 100 (citing *Patterson v. Illinois*, 487 U.S. 285 (1988)).

## C.

The district court's factual findings are reviewed for clear error. *See Yunis*, 859 F.2d at 958. The government argues that "initiation" is a fact question reviewed for clear error. Straker argues, however, that the ultimate question of whether those facts amount to an "initiation" under *Edwards* is reviewed *de novo*. Straker is correct. The question whether a given set of facts meets the legal threshold needed to overcome *Edwards*'s prophylactic protection of Fifth and Sixth

Amendment rights is reviewed *de novo*. *See United States v. Whaley*, 13 F.3d 963, 968–69 (6th Cir. 1994) ("While we accept, unless clearly erroneous, the facts that the district court found, whether those facts together constitute an 'initiation' under *Edwards* is a legal question we review *de novo.*"); *cf. Yunis*, 859 F.2d at 958 (waiver of Fifth and Sixth Amendment rights).

**D.**

**1.**

Because the government does not contest the issue, we assume without deciding that both the Fifth Amendment privilege against self-incrimination and the *Miranda* and *Edwards* doctrines govern the admissibility at trial of statements obtained by U.S. authorities from nonresident aliens who first assert their right to counsel while held in foreign custody.

Ordinarily a suspect can waive his *Miranda* rights. *See Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). But special protections apply once the suspect has invoked his constitutional right to counsel during custodial interrogation. When that happens, the Supreme Court has interposed a "second layer of prophylaxis." *Id.* (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)). "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation." *Edwards*, 451 U.S. at 484. That is because, "if a suspect believes that he is not capable of undergoing [custodial] questioning without advice of counsel, then it is presumed that any subsequent waiver . . . is itself the product of the 'inherently compelling pressures' [of custodial

interrogation] and not the purely voluntary choice of the suspect." *Roberson*, 486 U.S. at 681 (quoting *Miranda*, 384 U.S. at 467); *see also Montejo v. Louisiana*, 556 U.S. 778, 794–95 (2009) (*Edwards* prevents police from "badgering" a defendant into waiving his previously asserted "right to have counsel during custodial interrogation—which right happens to be guaranteed (once the adversary judicial process has begun) by [both the Fifth and Sixth Amendments.]"). Consequently, it is only when the subsequent questioning is "at the suspect's own instigation" that a valid waiver of *Miranda* rights will be found. *Shatzer*, 559 U.S. at 104 (internal quotation marks omitted).

The government does not dispute that Straker exercised his right to counsel during the January 9, 2006 interrogation when he said that he wanted to speak to his lawyer. As the case comes to us, the government has also conceded that Straker was in *Miranda* custody at the time of that interrogation, and that there was no break in that custody during the eighteen months leading up to the FBI's July 29, 2007 interrogation. Gov't Br. 191 n.96. We thus assume that the "judicially prescribed prophylaxis" of *Edwards* applies on these facts, *Shatzer*, 559 U.S. at 105, without needing to decide whether and for how long *Edwards* applies while the accused is held in continuing foreign custody. In addition, because Straker does not argue that any purported initiation of conversation with the FBI lapsed during the year and a half between when he left his phone message for Agent Freeman and the interrogation at which he confessed, we need not decide if an officer must immediately act upon, or whether a waiver of *Miranda* rights must follow closely on the heels of, a suspect's "initiation" of conversation with the authorities.

Once Straker invoked his right to counsel during an interrogation to which *Miranda* has been stipulated to apply,

the FBI could not "subject [him] to further interrogation . . . unless [Straker] himself initiate[d] further communication, exchanges, or conversations with the[m]." *Edwards*, 451 U.S. at 484–85. The parties agree that the plurality opinion in *Bradshaw* governs our inquiry into whether Straker's telephone call to Agent Freeman initiated discussion with the FBI. Straker Suppl. Br. 1 ("[T]he plurality opinion in *Oregon v. Bradshaw* does provide a framework for evaluating whether Straker evinced a willingness to engage in a generalized discussion."); Gov't Suppl. Br. 7–11 (arguing that the *Bradshaw* plurality controls the initiation question).

Under the *Bradshaw* framework, whether Straker's telephone message to Agent Freeman constitutes initiation turns on whether the statement "evinced a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46. On the other hand, if Straker's statement concerned "routine incidents of the custodial relationship"—"such as a request for a drink of water or a request to use a telephone," that would not suffice and the *Edwards* bar on further questioning would remain intact. *Id*. at 1045.

It bears noting that the "initiation" inquiry is distinct from, and antecedent to, the question whether "subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshaw*, 462 U.S. at 1044. The latter inquiry is rigorous, requiring that we determine whether the government has proven that the "purported waiver was knowing and intelligent," *id.* at 1046, and "indulge in every reasonable presumption against waiver," *Brewer v. Williams*, 430 U.S. 387, 404 (1977). In conducting the initiation inquiry, by contrast, we ask not what the suspect intended to do, but what intention the police officer "could reasonably have . . . interpreted" the suspect's

statements—even if "ambiguous"—to "evince[]," without any legal presumption one way or the other. *Bradshaw*, 462 U.S. at 1045–46.

Taken together and viewed from the perspective of a reasonable officer, both the content and the context of Straker's message "evinced a willingness and a desire" to reinitiate communications with the FBI concerning the criminal investigation. *Bradshaw*, 462 U.S. 1045–46. Straker, in fact, does not dispute that he called the number Agent Freeman had given him and left a voicemail message "asking Freeman to call him back." *Straker*, 596 F. Supp. 2d at 89, 94.

The government concedes that statement, considered in isolation, would not evince a desire to resume discussion of the investigation because it gives no specific indication of what Straker wished to discuss. Oral Arg. Tr. 131. We agree. But that statement does not stand alone. When considered in context and on this record, an officer could reasonably have understood Straker's statement as inviting renewed discussion about the investigation. Like the statement in *Bradshaw*—"Well, what is going to happen to me now?"—Straker's message asking Freeman "to call him back," *Straker*, 596 F. Supp. 2d at 89, "could reasonably have been interpreted by the officer as relating generally to the investigation," *Bradshaw*, 462 U.S. at 1046.

First, Straker left the voicemail just a couple weeks after specifically advising Agent Clauss and Agent Freeman that, once he spoke with his lawyer, he "would be willing to speak to" them. J.A. 2259. Indeed, as the district court explained, "[t]he record is compelling that Straker made his request for counsel subject to an understanding that he would have an opportunity to contact the FBI later if he so wished." *Straker*, 596 F. Supp. 2d at 93. Viewed in that context, Straker's

voluntary decision to call Agent Freeman a couple weeks later and leave a message asking Freeman to call him back could reasonably have been viewed as Straker following up where he left off with the FBI and initiating discussion of the investigation. *See United States v. Hart*, 619 F.2d 325, 326–27 (4th Cir. 1980) (per curiam) (concluding that defendant, after having twice invoked his right to counsel, reinitiated communication with law enforcement when "he telephoned the Washington Field Office stating that he wished to speak with the arresting agent").

Second, when during the interview Straker "indicated that 'after having access to his attorney, he would be willing to speak to the agents,'" *Straker*, 596 F. Supp. 2d at 87, Agent Clauss invited Straker, after talking with his attorney, to contact the FBI if he still wanted to talk. Agent Freeman then provided Straker a business card with a designated number to call "if he wanted to make an attempt to contact" them. J.A. 2191. And that designated number is the one Straker used to make his call.

Third, nothing about the context or content of Straker's message suggests that it was "a necessary inquiry arising out of the incidents of the custodial relationship." *Bradshaw*, 462 U.S. at 1046. Because Straker was not in actual or even apparent U.S. custody during the weeks between the initial interrogation and Straker's message, there is no plausible basis for concluding—and Straker does not even argue—that he was calling Agent Freeman to discuss his conditions of confinement or the future procedural course for him while in Trinidadian custody, neither of which the FBI could control. Moreover, when Straker called Agent Freeman, he had not yet been indicted in the United States, so a reasonable officer would not have interpreted Straker's call as inquiring about extradition or other aspects of criminal processing. Nor

would it have made sense for Straker to call Agent Freeman to request a drink of water, *see Bradshaw*, 462 U.S. at 1045, discuss "procedural matters" like "bond, scheduling, and a preliminary hearing," *Haynes v. State*, 934 So. 2d 983, 989–91 (Miss. 2006), or talk about anything else relating to the routine aspects of being in police custody.

Straker nevertheless argues (Suppl. Br. 1) that there was another possible reason for his call:   an effort to seek the FBI's aid in locating his father.   He points to a conversation he had with Agent Clauss during the January 9th interrogation in which he stated that Clauss resembled his father and suggested that the FBI might be able to help find his father in the United States.   Straker Suppl. Br. 8–11; *see also Straker*, 596 F. Supp. 2d at 86.   But the district court found that the comment was understood at the time to be a "joke[]," *Straker*, 596 F. Supp. 2d at 86, part of what Agent Clauss described as a "jovial" story, not a serious request, J.A. 2187.   In any event, the question is not whether the initiation of discussion about the investigation is the only possible explanation for Straker's reaching out.   The relevant question is whether a reasonable officer could have understood Straker's telephone call as indicating that Straker wanted to talk generally about the investigation.   Although we, like the district court, think this is a "close call," *Straker*, 596 F. Supp. 2d at 94, considering the content and all the surrounding circumstances, the FBI agents could reasonably have interpreted Straker's voluntary reaching out and the message he left as "evinc[ing] a willingness and a desire for a generalized discussion about the investigation" itself.   *Bradshaw*, 462 U.S. at 1045–46.

**2.**

While Straker initiated conversation with the FBI relating to the investigation, the burden remains on the government to

prove that, under the totality of the circumstances, Straker subsequently waived his *Miranda* rights voluntarily, knowingly, and intelligently. *See Bradshaw*, 462 U.S. at 1044. Reviewing the district court's finding of waiver *de novo*, *see Yunis*, 859 F.2d at 958, we affirm.

To begin with, the record amply demonstrates that Straker understood his rights and the significance of any waiver decision. During Straker's January 2006 interview, the FBI advised him of his *Miranda* rights, and he "demonstrated that he understood his rights well enough to make an initial decision declining to speak about the investigation until he had consulted with his Trinidad[ian] attorney." *Straker*, 596 F. Supp. 2d at 95. Agent Clauss advised Straker of his *Miranda* rights a second time during extradition, using the FBI's standard advice-of-rights form. And Straker, having had eighteen months to consult with his attorney, signed the waiver-of-rights statement. *Id.* There is no indication that Straker was coerced into signing that statement. Nor was there any opportunity for the FBI to badger Straker into doing so, since no one from the FBI even contacted Straker for the year and a half preceding his extradition. *See id.* at 96–99.

Straker does not challenge any of the district court's factual findings and points to no facts undermining the reliability of the waiver, resting his argument entirely on the "presumption against waiver of constitutional rights." Def. Br. 140. But the presumption is just that—a presumption that can be, and in this case was, overcome.

**3.**

Straker footnotes an argument that, because his Sixth Amendment right to counsel attached after the message he left for Agent Freeman, that message could not have constituted a

waiver of that right. Def. Br. 141 n.60. Maybe. But that is beside the point. We agree with the district court that the *Miranda* warnings provided by the FBI during Straker's extradition—after his Sixth Amendment right to counsel had attached—"sufficiently apprised Straker of 'the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on [that] basis will be considered a knowing and intelligent one.'" *Straker*, 596 F. Supp. 2d at 101 (quoting *Patterson*, 487 U.S. at 296) (alteration in original). Thus, when Straker validly waived his Fifth Amendment rights after being given *Miranda* warnings, he waived his Sixth Amendment right to counsel as well. *See Patterson*, 487 U.S. at 300 ("So long as the accused is made aware of the dangers and disadvantages of self-representation during postindictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is knowing and intelligent.") (internal quotation marks omitted); *see also Montejo*, 556 U.S. at 795 ("[T]he right under both [the Fifth and Sixth Amendments] is waived using the same procedure.").

## VIII.

### Denial of Defendants' Motions for Severance

Defendants Sealey and Straker challenge the district court's refusal to sever the charges against them, arguing that the evidence presented against their codefendants at trial compromised the jury's ability to make an individualized determination of guilt as to each of them.[19]

---

[19] In footnotes, additional defendants seek to join Sealey and Straker's severance arguments. The same legal standards apply to each defendant's motion to sever, but the fact-specific nature of the

"Joint trials play a vital role in the criminal justice system," promoting efficiency and avoiding the "scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotation marks omitted). For these reasons, and to "'conserve the time of courts, prosecutors, witnesses, and jurors,'" we have urged district courts to grant severance "sparingly." *United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010) (quoting *United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir. 1976)). Severance is warranted where there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Where joinder of defendants in an indictment or trial "appears to prejudice a defendant," district courts should, in their discretion, order separate trials. Fed. R. Crim. P. 14(a). Severance is not required, however, "when there is substantial and independent evidence of each [defendant's] significant involvement in the conspiracy." *United States v. Moore*, 651 F.3d 30, 96 (D.C. Cir. 2011) (alteration in original) (internal quotation marks omitted), *aff'd on other grounds sub nom.*, *Smith v. United States*, 133 S. Ct. 714 (2013). Moreover, "[a]bsent a dramatic disparity of evidence" against defendants whose trials might be joined, "any prejudice caused by joinder is best dealt with by

inquiry renders adoption by reference inappropriate. *See supra* note 5; *United States v. Solis*, 299 F.3d 420, 441 n.46 (5th Cir. 2002) ("[S]everance issues are fact-specific, requiring a showing of 'specific compelling prejudice,' and so cannot be [] adopted by reference.") (internal citation omitted). Only Sealey and Straker have attempted to apply the law, as they see it, to the evidence that pertains to them. We decline to determine in the first instance, without defendant-specific briefing, how the law applies to their codefendants as well. *See generally Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

instructions to the jury to give individual consideration to each defendant." *United States v. Slade*, 627 F.2d 293, 309 (D.C. Cir. 1980); *see Zafiro*, 506 U.S. at 539. "We review the denial of a motion to sever for abuse of discretion, which we will not find if the jury could reasonably compartmentalize the evidence introduced against each individual defendant." *Celis*, 608 F.3d at 844 (internal quotation marks omitted).

Sealey argues that he suffered prejudice from the joint trial because he "participated in a kidnapping" but "had no part in" the victim's death, creating a risk that the evidence against Sealey's codefendants would "rub off" on him. Def. Br. 122–23. In addition, both Sealey and Straker contend that they were prejudiced by the introduction of evidence of past hostage takings, discussed *supra* Section III, in which they did not participate. The district court addressed and rejected defendants' "spillover prejudice" arguments, concluding that the substantial and independent evidence against Sealey and Straker enabled the jury to reasonably compartmentalize the evidence of guilt against each of them from the rest of the evidence at trial. *Clarke*, 767 F. Supp. 2d at 26.

Defendants assert that the district court misapplied the law governing severance. We see no legal error. The district court not only measured the strength of the evidence against Sealey and Straker, but also the degree to which it was independent of the evidence against their codefendants. Both assessments were critical to determining whether the evidence against them was sufficiently "substantial" and "independent." *See, e.g.*, *Celis*, 608 F.3d at 844–45.

The evidence the government introduced of Sealey and Straker's guilt was both substantial and independent. A reasonable jury could have found that the government's evidence established their culpability and role in the

conspiracy. As the district court determined, Sealey's detailed confession to the Trinidadian police, a separate confession to the FBI, and trial testimony from two co-conspirators overwhelmingly supported the jury's conclusion that he was one of the conspirators who abducted Maharaj at the Samaan Tree Bar. Sealey, with his codefendants, participated in the getaway as well, transporting Maharaj to the cocoa fields where he was initially held. While the evidence did not show him to have participated in every stage, it sufficed to support the jury's finding that Sealey played a significant role in the hostage taking.

Straker, too, confessed to his role in the hostage taking, and his confession was supplemented by his own trial testimony and the trial testimony of three co-conspirators. Indeed, one of Straker's co-conspirators testified that the kidnapping was Straker's idea. The evidence of Straker's guilt, like that of Sealey's, was substantial and independent from the evidence introduced against their codefendants, such that the jury could readily compartmentalize the evidence against each of them from the rest of the evidence at trial.

The presentation of other-crimes evidence also did not prejudice Sealey and Straker. That evidence did not concern them, and, as we have already discussed, the district court gave adequate limiting jury instructions in connection with the presentation of that evidence. Sealey and Straker fail to identify any defect in the manner in which the other-crimes evidence was presented that might have led the jury erroneously to apply it against them.

Straker's reliance on our decision in *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) (per curiam), is not persuasive. In that case, Ignacio Novo was charged alongside members of an underlying conspiracy to assassinate the

Chilean Ambassador to the United States. The charges against Novo, however, were limited to making false statements to a grand jury and misprision of a felony. We held that the joint trial prejudiced Novo because the "grossly disparate" charges and intermingled presentation of evidence at trial created a situation in which "[t]here was never [a] clear distinction between the different defendants and the evidence against each of them."[20] *Id.* at 645, 647. Disparate charges also led the Sixth Circuit to require severance in *United States v. Davidson*, 936 F.2d 856, 861 (6th Cir. 1991). There were no such defects here. Sealey and Straker were instrumental participants in the conspiracy to take Maharaj hostage, they were charged with the same offenses as their codefendants, and the evidence presented at trial was not intermingled so as to create the false impression that Sealey or Straker were involved in any of the uncharged conduct.

If there were any such prejudice, moreover, it would have been cured by the district court's carefully selected and crafted jury instructions. The judge gave well-timed cautions to jurors at key points: on the first day of trial; before the introduction of the other-crimes evidence; a final "Other Crimes Evidence" instruction at the close of trial; and a final instruction reiterating that "each defendant is entitled to have the issue of his guilt as to each of the crimes for which he is on trial determined from his own conduct and from the evidence that applies to him as if he were being tried alone." J.A. 1929

---

[20] A further distinguishing feature between this case and *Sampol* is that our holding there expressly rested on "a cumulation of circumstances" that prejudiced defendant Novo: confusion of charges, grossly disparate charges, and Novo's inability to present a full defense and cross-examine witnesses whose testimony implied that he participated in additional crimes for which he was not charged. *Sampol*, 636 F.3d at 651.

(emphasis omitted); *see also* J.A. 1931 (Instruction 2.55); J.A. 3026–27, 3205–07.

It is in the nature of a conspiracy prosecution that the evidence against each member will differ, and that the members of the conspiracy will have different roles. That some co-conspirators will be more central than others does not render joint trial inappropriate as long as the jury can reasonably compartmentalize the substantial and independent evidence against each defendant. *See, e.g.*, *Celis*, 608 F.3d at 844–45; *United States v. Mejia*, 448 F.3d 436, 446–47 (D.C. Cir. 2006). We find no abuse of discretion here, where the government presented substantial and independent evidence against Sealey and Straker establishing their significant roles in the conspiracy, and the district court sought to cure any potential prejudice with careful instructions to the jury.

## IX.

### Closing Argument

Defendants Sealey and Nixon object to the government's rebuttal closing argument, claiming that the prosecution advanced an alternative factual theory of guilt for Sealey and Nixon that was inconsistent with the evidence at trial and the government's initial closing argument. [21] We review

---

[21] Defendants De Four and Straker purport to adopt by reference Sealey and Nixon's objection to the government's rebuttal closing. Def. Br. 130 n.57. As discussed *supra* note 5, not every argument is an appropriate candidate for adoption by reference. Sealey and Nixon make a fact-specific objection to the government's purported shift in theory of their guilt during closing argument. De Four and Straker do not explain how that objection could apply to them as well, and we refrain from guessing.

allegedly improper prosecutorial argument for "substantial prejudice," and the district court's denial of defendants' motions for new trials based on that objection for abuse of discretion. *Moore*, 651 F.3d at 50.

Sealey and Nixon contend that the government's evidence and initial closing argument were aimed at proving that Sealey entered the Samaan Tree Bar, grabbed Maharaj, and dragged him outside to the waiting Nixon. They characterize the government's rebuttal closing argument as advancing the contrasting theory that it was Nixon who entered the bar, not Sealey. After comprehensively reviewing the evidence at trial and the government's two closing arguments, the district court found defendants' characterization of the proceedings "wholly lacking in merit" and "simply not borne out by the record." *Clarke*, 767 F. Supp. 2d at 91, 94. We do as well.

The evidence at trial included testimony that two men entered the bar and "grabbed" Maharaj, J.A. 2895–96, and that Nixon exited first, followed by Sealey, who was "pulling [Maharaj] out of the bar," J.A. 3061. Sealey's statement to the Trinidadian police also indicated that he and another man both "went inside the bar," and that both he and another man "end[ed] up sticking the man up." J.A. 4395. Consistent with that evidence, the prosecutor argued in closing that both Sealey and Nixon entered the bar. J.A. 4966. Nothing in the government's evidence at trial, or in its initial closing, suggested that Sealey alone entered the Samaan Tree Bar.

In his closing argument, it was Sealey who argued that he was not the man who "went in and grabbed Mr. Maharaj" because some eyewitnesses described a muscular gunman wearing a "rasta hat," and Sealey was neither muscular nor was there any evidence that he wore such a hat. J.A. 5094–97. Sealey's argument implied that only one abductor entered the

bar, and that it was not him. In response, the prosecutor argued that the eyewitness testimony was not inconsistent with the government's theory that both Sealey and Nixon entered the bar, and that it was Nixon who was muscular and wearing a "rasta hat." J.A. 5194–95.

We see no necessary inconsistency between the prosecutor's rebuttal and the initial closing arguments, nor with the evidence at trial. The government argued throughout that Sealey and Nixon entered the Samaan Tree Bar and abducted Maharaj. The evidence supported that theory. Granted, two eyewitnesses testified that only one gunman entered, which presented Sealey and Nixon each with an opportunity to claim he was not involved. *See Clarke*, 767 F. Supp. 2d at 92. But, as the district court concluded, the fact that eyewitnesses may "have inconsistent recollections on some points is no surprise." *Id.* The jury could reasonably have credited testimony describing Nixon's actions without also crediting the witnesses' recollection that Nixon entered the bar alone. As the government consistently argued, other evidence supported the conclusion that both Sealey and Nixon abducted Maharaj.

Defendants have failed to show the "substantial prejudice" from a prosecutorial argument that is required to warrant a new trial. *Moore*, 651 F.3d at 50. As just noted, the government's evidence and closing arguments were consistent. We find no error—much less an abuse of discretion—in the district court's denial of Sealey and Nixon's motions for new trials based on the prosecutor's rebuttal closing argument.

## X.

### Due Process Claim

Straker argues that he was deprived of his Fifth Amendment right to due process because he was unable to obtain "Blue Files" from Trinidadian authorities, which he contends are law enforcement records documenting charges, arrests, or convictions of persons in Trinidad, including the cooperating witnesses. *Clarke*, 767 F. Supp. 2d at 70–71. Straker argues that the information might have assisted his impeachment of witnesses who testified against him. *Id.* at 70–71.[22]

The district court denied Straker's motion for a new trial, finding no due process violation. We agree completely with the district court's analysis and affirm. We review the denial of a motion for a new trial for an abuse of discretion, *see United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010), though we review *de novo* the constitutional question whether any limitation on Straker's defense violated his Fifth Amendment right to due process, *see United States v. Lathern*, 488 F.3d 1043, 1045–46 (D.C. Cir. 2007).

The "right to present a defense is a fundamental element of due process of law, and the preclusion of all inquiry by the defense on a particular aspect of the case violates that right." *United States v. Stewart*, 104 F.3d 1377, 1384 (D.C. Cir. 1997) (citations and internal quotation marks omitted). Straker, however, has failed to demonstrate any material impairment of his defense.

---

[22] Clarke, De Four, and Sealey adopt this claim. Def. Br. 141 n.61. Our analysis applies equally to those defendants.

First, Straker has not demonstrated that the "Blue Files" he sought even exist, and the government's inquiries to Trinidadian officials suggest that they do not. Nor does Straker explain what information the Blue Files would have contained that he did not already receive in the arrest and conviction records provided to him by the prosecution. There thus is no evidence that the district court or prosecution impeded any viable avenue of inquiry.

Second, Straker enjoyed a robust opportunity to cross-examine the cooperating witnesses and to attack their credibility based on the arrest and conviction records that the U.S. government disclosed. Straker makes no proffer that the Blue Files would have allowed him to pursue any line of impeachment that he did not already cover. On top of that, Straker had ample opportunity, even without the arrest records, to impeach the cooperating witnesses with their plea agreements and quests for leniency at sentencing. *See Clarke*, 767 F. Supp. 2d at 67–71 (chronicling defense counsel's "extensive" impeachment efforts). That alone answers Straker's claim that he was precluded from "all inquiry" into the witnesses' credibility. *See Stewart*, 104 F.3d at 1384 (court did not "preclude all defense inquiry" into issue by "rul[ing] out repetitive questioning and further questioning of the expert witness").

Third, the Due Process Clause governs the conduct of the court and the prosecution, not of foreign governments' responses to letters rogatory. Straker, however, identifies nothing that either the court or prosecution did wrong. Quite the opposite, Straker acknowledges that the district court "was completely accommodating" in granting to defense counsel whatever investigative resources were needed, authorizing the issuance of letters rogatory seeking documents from Trinidad

through diplomatic channels, and permitting defense counsel to travel to Trinidad several times. Def. Br. 141 n.62. In addition, the U.S. government repeatedly inquired about the so-called "Blue Files" with "knowledgeable individuals in the Trinidadian government, and was informed" that such files did not exist. *Clarke*, 767 F. Supp. 2d at 71.

In sum, because Straker did not establish that the Blue Files even exist, that they contain any impeachment information materially different from what he already had and used, or that the district court or prosecution did anything at all to impair his presentation of a defense, no due process violation occurred, and the district court's denial of the motion for a new trial was well within its discretion.

## XI.

### Admissibility of Expert Fingerprint Testimony

Straker's challenge to the admission of expert fingerprint testimony fares no better.[23]

To demonstrate Straker's consciousness of guilt, the government introduced as evidence a note with an accompanying news article that Straker sent Percival in which Straker asked Percival not to testify. *Clarke*, 767 F. Supp. 2d at 23. The news article suggested "that the U.S. Attorney's Office did not have the power to ensure that a court would grant [Percival] leniency for his cooperation." *Id.* The note

---

[23] De Four purports to join Straker's argument. Def. Br. 145 n.65. De Four did not join Straker's motion below, so we would review his claim for plain error only. Because we find no error at all, De Four's claim necessarily fails.

was linked to Straker through the testimony of FBI fingerprint examiner Dawn Schilens. *Id.*

At the outset, Schilens testified "on her qualifications as an expert in the field of fingerprint identification and analysis, which included employment as a physical scientist/forensic examiner in the latent print operation unit of the FBI, her certification following an 18-month training program, and her experience in having conducted over 140,000 fingerprint comparisons." *Clarke*, 767 F. Supp. 2d at 73. When the government offered Schilens as an expert in the field of fingerprint identification, Straker did not object. *Id.* After she testified, however, Straker moved to strike her testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), arguing that Schilens failed "to articulate an error rate" in the fingerprint methodology she used. *Clarke*, 767 F. Supp. 2d at 73.

The district court denied the motion to strike and the subsequent motion for a new trial, finding that "Schilens did present testimony on the error rate." *Clarke*, 767 F. Supp. 2d at 73. Finding no abuse of discretion, *see United States v. Day*, 524 F.3d 1361, 1369 (D.C. Cir. 2008), we affirm.

The admission of expert testimony is governed by Federal Rule of Evidence 702. In *Daubert*, the Supreme Court held that Rule 702 requires a district court, before admitting expert testimony, to determine whether the "reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue," 509 U.S. at 592–93. Among the factors *Daubert* instructed courts to consider in determining the reliability "of a particular scientific technique" is the "known or potential rate of error." 509 U.S. at 594.

Here, Schilens "testified that there are two different types of error—the error rate in the methodology and human error." *Clarke*, 767 F. Supp. 2d at 73 (citations omitted). She further testified that her "'methodology, ACE–V, does not have an inherent rate of error'—that is, '[t]here is a zero rate of error in the methodology.'" *Id.* (citations omitted) (alteration in original). But Schilens did not articulate the rate of human error, though she acknowledged the potential for such error. *See id.*

Straker contends that Schilens's failure to articulate the rate of human error in the ACE-V methodology rendered her testimony based on that methodology inadmissible. That is wrong. The factors listed in *Daubert* "do not constitute a definitive checklist or test," but rather "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotation marks and alteration omitted). No specific inquiry is demanded of the trial court. *See id.* at 152.

The reliability of Schilens's fingerprint methodology was "properly taken for granted." *Kumho Tire*, 526 U.S. at 152. "Numerous courts have found expert testimony on fingerprint identification based on the ACE-V method to be sufficiently reliable under *Daubert*," and "against such a backdrop, it is difficult to discern," without more, "any abuse of discretion when the district court decides to admit expert testimony that relies on the ACE-V method." *United States v. Peña*, 586 F.3d 105, 110–11 (1st Cir. 2009) (internal quotation marks omitted) (collecting cases).

Beyond that, Straker has identified no harm resulting from the admission of Schilens's testimony. Evidence at trial

showed that Straker played a pivotal role in the conspiracy from its inception, and the testimony of the cooperating witnesses established that he played a central role in plotting the crime's execution. That testimony, coupled with Straker's confession, constituted "devastating evidence" of Straker's guilt. *United States v. Smith*, 640 F.3d 358, 368 (D.C. Cir. 2011). There is no reasonable possibility that the admission of Schilens's testimony with its omitted human error rate had any "discernible effect on the jury's verdict." *Id.*

## XII.

For the foregoing reasons, we affirm defendants' convictions and the judgment of the district court.

*So ordered.*